**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

---------------------------------------------------- **X**
In re:  **CHAPTER 11**
                                                                              **:**
**WINDSOR MARKETING GROUP, INC. :**          **CASE NO. 18-20022 (JJT)**
---------------------------------------------------- **X**

---

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

---

Dated: June 25, 2019

ZEISLER & ZEISLER, P.C.
James Berman
Matthew K. Beatman (ct08923)
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Tel: (203) 368-4234
mbeatman@zeislaw.com
Counsel for the Debtor and Debtor in Possession

## DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION

Windsor Marketing Group, Inc. (the "Debtor"), as debtor and debtor in possession, proposes this Third Amended Chapter 11 Plan of Reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in ARTICLE I.A of the Plan. The Debtor is the proponent of this Plan within the meaning of § 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of, among other things, the Debtor's history and businesses leading up to the commencement of the Chapter 11 Case and for a summary and analysis of this Plan and the treatment of Claims provided for herein. The Plan provides for the reorganization of the Debtor.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in the Plan, the following terms shall have the following meanings when used in capitalized form (and their plural or singular forms shall have correlative meanings). Any term used in the Plan that is not defined in this Article I, but is defined in the Bankruptcy Code, the Bankruptcy Rules or the Disclosure Statement shall have the meaning ascribed to such terms in the Bankruptcy Code, the Bankruptcy Rules or the Disclosure Statement, as the case may be.

1.    "Administrative Creditor" means any Creditor entitled to payment of an Administrative Claim.

2.    "Administrative Claim" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to Bankruptcy Code § 503(b), including, without limitation, (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estate and operating the businesses of the Debtor; (b) Professional Fees; and (c) all fees and charges assessed against the Estate pursuant 28 U.S.C. § 1930.

3.    "Administrative Claims Bar Date" means the Business Day which is thirty (30) days after the Confirmation Date or such other date as approved by order of the Bankruptcy Court.

4.    "Affiliate" means an "affiliate" as defined in § 101(2) of the Bankruptcy Code.

5.    "Allowed" (this term is used both separately and in conjunction with other defined terms in the Plan (*e.g.*, Allowed Priority Tax Claim)) means, except as otherwise provided herein,

(a) a Claim or Equity Interest specifically allowed under the terms of the Plan, (b) a Claim or Equity Interest that has been allowed by a Final Order or in a stipulation of amount and nature of the Claim or Equity Interest executed by the Reorganized Debtor on, or after, the Effective Date, (c) an Equity Interest or Claim as reflected by a Proof of Claim, timely Filed or deemed timely Filed, or (d) if the Proof of Claim has not been timely Filed or deemed timely Filed, the Claim as reflected in the Schedules if therein listed as undisputed, unliquidated and not contingent or the Equity Interest as reflected in the Schedules; provided that in the case of allowance under either subsections (c) or (d), any Claim's allowance is subject to any limitations imposed by § 502 of the Bankruptcy Code; and provided further that allowance under subsections (c) and (d) only is applicable if the Claim or Equity Interest is not timely Disputed; and provided also that allowance under subsections (c) and (d) only apply once either (1) the Debtor or the Reorganized Debtor have determined not to object to the Claim, or (2) the last day to timely object to such Claim has passed.

6.      "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination or other claims, actions or remedies that may be brought by and on behalf of the Debtor or its Estate under Chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law.

7.      "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

8.      "Bankruptcy Court" means the United States Bankruptcy Court for the District of Connecticut, Hartford Division.

9.      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Case.

10.      "Bar Date" means the deadline set by order of the Bankruptcy Court for Filing Proofs of Claim in the Chapter 11 Case.

11.      "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

12.      "Case" means the Debtor's voluntary case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, under chapter 11 of the Bankruptcy Code, and styled *In re Windsor Marketing Group, Inc.*, Case No. 18-20022.

13.      "Cash" means the legal tender of the United States of America or the equivalent thereof.

14.      "Cause of Action" means any action, proceeding, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, reduced to judgment or not reduced to judgment, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other

theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to § 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in § 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

15.    "Claim" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, disputed, undisputed, legal, equitable, secured or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

16.    "Claims Register" means the official register of Claims as maintained by the clerk of the Bankruptcy Court.

17.    "Class" means a category of holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to §§ 1122(a) and 1123(a) of the Bankruptcy Code.

18.    "Collateral" means any property or interest in property of any Debtor's Estate that is subject to a valid and enforceable Lien to secure a Claim.

19.    "Committee" means the official committee of unsecured creditors in the Chapter 11 Case appointed on in the Case, pursuant to § 1102 of the Bankruptcy Code.

20.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

21.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court pursuant to § 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

22.    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to § 1129 of the Bankruptcy Code.

23.    "Consummation" means the occurrence of the Effective Date.

24.    "Creditor" means any holder of a Claim against any Debtor(s).

25.    "Cure" means the payment or other honor of all obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to § 365 of the Bankruptcy Code, including, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law:  (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to § 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy

Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to § 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such lesser amount as may be agreed upon by the parties, under such executory contract or unexpired lease.

26.    "Debtor" means, Windsor Marketing Group, Inc.

27.    "Disclosure Statement" means that certain Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

28.    "Disputed" means, with respect to a Claim, Equity Interest or any portion thereof that is not specifically Allowed under the Plan, that such Claim, Equity Interest or portion thereof: (a) is the subject of an objection or request for estimation filed by any of the Debtor or any other party in interest in accordance with applicable law, which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; (b) has not been otherwise Allowed and is scheduled by the Debtor as contingent, unliquidated, or disputed; or (c) is otherwise disputed by any of the Debtor or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved, or overruled by a Final Order.

29.    "Effective Date" means the first Business Day after the Confirmation Order becomes a Final Order and the conditions set forth in Article VIII have been satisfied or waived...

30.    "Entity" means and includes person, estate, trust, governmental unit, and United States trustee.

31.    "Equity Interest" means any equity security (as defined in Bankruptcy Code § 101(16)) in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock or limited company interests, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to the Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and put rights; and (4) stock-appreciation rights.  The term "Equity Interest" also includes any Claim that is determined to be subordinated to the status of an Equity Security by Final Order of the Bankruptcy Court, whether under general principles of equitable subordination, § 510(b) of the Bankruptcy Code, or otherwise.

32.    "Estate" means the bankruptcy Estate of the Debtor created by virtue of § 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

33.    "Exculpated Parties" mean the Debtor's attorneys, financial advisors investment banker and accountants, the Committee and its members (solely in their representative capacity), employees, agents or professionals retained by each Committee member  and the Committee's attorneys and accountants.

34.     "Executory Contract" means a contract to which any Debtor is a party that is subject to assumption or rejection under §§ 365 or 1123 of the Bankruptcy Code.

35.     "File" or "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

36.     "Final Order" means an order or judgment of the Bankruptcy Court, the operation or effect of which has not been reversed, stayed, modified or amended and which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, re-argument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined to be in effect by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order; provided, further, that the Debtor or the Reorganized Debtor, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

37.     "Governmental Unit" means a "governmental unit" as defined in § 101(27) of the Bankruptcy Code.

38.     "Lien" means a charge against or interest in property to secure payment of a debt or performance of an obligation.

39.     "Local Rules" means the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Connecticut.

40.     "Non-Tax Priority Claim" means any Claim accorded priority in right of payment under § 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

41.     "Person" means a "person" as defined in § 101(41) of the Bankruptcy Code and also includes any limited liability company, firm, trust, association or other Entity, whether acting in an individual, fiduciary or other capacity.

42.     "Petition Date" means January 8, 2018, the date on which the Debtor commenced the Chapter 11 Case.

43.     "Plan" means the Debtor's Chapter 11 Plan of Reorganization, including all exhibits, schedules, supplements, and appendices thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time in accordance with the terms herein.

44.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in § 507(a) (8) of the Bankruptcy Code.

45.    "Pro Rata" means, proportionately, so that the ratio of (i) (1) the amount of property to be waived or distributed on account of such Claim to (2) the amount of such Claim, is the same as the ratio of (ii) (1) the amount of property to be waived or distributed on account of all Claims of the Class, Classes or group sharing in such waiver, distribution or otherwise to (2) the amount of all Claims in such Class, Classes or group.

46.    "Professional" means any Entity employed in the Chapter 11 Case pursuant to §§ 327 or 1103 of the Bankruptcy Code or otherwise.

47.    "Professional Fees" means an Allowed Claim under §§ 328, 330(a) or 331 of the Bankruptcy Code.

48.    "Proof of Claim" means a proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

49.    "Related Persons" means, with respect to any Entity, such Entity's predecessors, successors, assigns, managed accounts or funds, and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of its respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), partners, agents, managers, managing members, advisory board members, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, management companies, fund advisors, and other professionals, and any Person claiming by or through any of them, in each case acting in such capacity as such relates to the Debtor or the Reorganized Debtor and not as it relates to any other matter.

50.    "Reorganized Debtor" means the Debtor, as reorganized pursuant to this Plan on or after the Effective Date.

51.    "Schedules" means the schedules of Assets and liabilities, statements of financial affairs, lists of holders of Claims and Equity Interests and all amendments or supplements thereto, including any global notes, statement of Limitations, methodology and disclaimers incorporated by reference therein, Filed by the Debtor with the Bankruptcy Court (as may be amended, modified or supplemented from time to time) to the extent such Filing is not waived pursuant to an order of the Bankruptcy Court.

52.    "Secured Claim" means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to a valid right of setoff under § 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to § 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to § 553 of the Bankruptcy Code.

53.    "Stamp or Similar Tax" means any stamp tax, document recording tax, personal property tax, conveyance fee, intangibles or similar tax, mortgage tax, mortgage recording tax, real estate transfer tax, sales tax, use tax, Uniform Commercial Code filing or recording fee, transaction

privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), regulatory filing or recording fee, and other similar taxes or other assessments imposed or assessed by any Governmental Unit.

54.   "Unsecured Claim" means any prepetition Claim against any Debtor that is not a: (a) Administrative Claim; (b) Priority Tax Claim; (c) Non-Tax Priority Claim; (d) Secured Claim; or (e) Equity Interest.

"Voting Deadline" means the date set by the Bankruptcy Court in the order approving the Disclosure Statement as the last date that Holders of Claims may vote to accept or reject the Plan.

**B.**    *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in § 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (10) any effectuating provisions may be interpreted by the Reorganized Debtor in a manner consistent with the overall purpose and intent of the Plan, all without further notice to or action, order, or approval of the court or any other entity, and such interpretation shall control in all respects; (11) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; and (12) any docket number references in the Plan shall refer to the docket number of any document Filed with the Court in the Chapter 11 Case.

**C.**    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**D.**    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Connecticut, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Reference to the Debtor or the Reorganized Debtor*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor or the Reorganized Debtor shall mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

G.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided, however, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS
## AND STATUTORY FEES

In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III hereof.

A.    *Administrative Claims*

Except with respect to Administrative Claims that are for Professional Fees and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Case or a holder of an Allowed Administrative Claim and the Debtoragree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; provided that Allowed Administrative Claims that arise in the ordinary course of the Debtor's business shall be paid in the ordinary course of business in accordance with

the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously allowed by Final Order.

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are for Professional Fees, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtor no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property and such Administrative Claims shall be deemed discharged as of the Effective Date.  On or before the Effective Date, the Debtor shall file and serve a Notice of Effective Date and Administrative Claims Bar Date on all creditors which notice shall set forth the Administrative Claims Bar Date and the procedure for filing a request for payment of an Administrative Claim, including the address where all such requests for payment of Administrative Claims must be sent.

**B.**    *Accrued Professional Fees*

1.    Final Fee Applications for Professional Fees and Payment of Professional Fees

All final requests for payment of Professional Fees incurred during the period from the Petition Date through the Effective Date other than for the Debtor's counsel shall be filed no later than ninety (90) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Court orders, the Allowed amounts of such Professional Fees shall be determined by the Court.  The amount of Professional Fees owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtor.  The Debtor estimates that professional fees, including fees for the Debtor's investment advisor, may total approximately $900,000 to $1,000,000, but the actual number may vary and depend on litigation and the confirmation process. In addition to cash from ongoing operations, the Debtor and the Reorganized Debtor intend to use the proceeds from any recovery of the claim against Toy R Us, cash on hand and any refund or proceeds from any refund from a tax refund from the State of Massachusetts to pay allowed Professional Fees over a four-year period in no less than equal monthly installments commencing within sixty days of the Effective Date. The Debtor and Committee Professionals have consented to the four-year payout period set forth herein. Zeisler & Zeisler, P.C., TrueNorth and Committee Professionals shall be entitled to a carveout from any liens of the assets of the Debtor on any tax refund that is received or credited to the Debtor or this estate concerning the State of Massachusetts and/or that is received from or on account of any claim, including any account receivable, that is owed by Toys R Us to the Debtor, with such parties retaining the exclusive right to be paid from these sources (collectively the "A/R Carve-out") effective on the Confirmation Date.  In addition, Zeisler & Zeisler, P.C., TrueNorth andthe Committee Professionals shall be entitled to a carveout from any liens and to be paid at closing (or held in escrow for their sole and exclusive benefit) in the amount of $175,000.00 in the event that the Reorganized Debtor closes the refinance with a proposed M&E Lender and/or A/R Lender in an amount necessary to satisfy the Allowed Secured Claims of Peoples. As of the date the Plan has been executed, People's has not consented to the additional carveout in the amount of $175,000.00.

2.      Estimation of Fees and Expenses

The Committee's Professionals shall estimate their Professional Fees before and as of the Confirmation Date and shall deliver such estimate to the Debtor no later than ten (10) days prior to the Effective Date (it being understood that it shall not be a condition precedent to the occurrence of the Effective Date that such estimates have been provided); provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional, and such Professionals are not bound to any extent by the estimates. If any of the Debtor's or the Committee's Professionals fail to provide an estimate or does not provide a timely estimate, the Debtor may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall be utilized by the Debtor to determine the Administrative Claims as of the Effective Date.

3.      Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtor or Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtor.  Upon the Confirmation Date, any requirement that Professionals comply with §§ 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

C.      *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement release and discharge of each Allowed Priority Tax Claim, on the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor or Reorganized Debtor: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by such holder and the Debtor or Reorganized Debtor, as applicable; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtor, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in quarterly installment payments over a period not more than five years after the Petition Date, pursuant to § 1129(a)(9)(C) of the Bankruptcy Code.   The Debtor estimates that Priority Tax Claims total approximately $72,000.00.

D.      *Statutory Fees*

All fees due and payable pursuant to § 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtor.  On and after the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable, and shall file with the Court monthly or request and file quarterly reports.  The Debtor will remain obligated to pay quarterly fees to the

U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

*E. CONSTELLATION NEWENERGY, INC. ("CNE")*

To the extent the Court enters an order approving the proposed settlement between the Debtor and CNE, on the Effective Date, CNE will have an allowed administrative expense claim in the reduced amount of $150,000.00 (the "CNE Administrative Expense Claim") less any payments it may have received after February 1, 2019, the balance of which is to be paid as follows: $25,000.00 within seven (7) days after a Final Order enters approving a stipulation approving a settlement with CNE (or if no stipulation or order approving same has entered, the Effective Date, and beginning on the 1st or 15th day of the following month that is at least two-weeks from the date that the $25,000.00 payment set forth in this paragraph was made to CNE, the Debtor will pay CNE $10,416.66 twice per month (on the first and 15th) until the CNE Administrative Expense Claim is paid in full without interest in full satisfaction of the CNE Administrative Claim. For avoidance of doubt, the Debtor is making only one payment of $25,000.00 toward the CNE Administrative Claim either before or after Confirmation. As of the date the Plan has been executed, the Committee has not agreed to the proposed settlement between the Debtor and CNE or the proposed payment schedule on the CNE Administrative Claim. CNE has not agreed to any material changes to the proposed settlement set forth in the Third Amended Disclosure Statement and/or Third Amended Plan

*F. FUJIFILM NORTH AMERICA CORPORATION*

Fujifilm North America Corporation ("Fujifilm") shall have an Allowed Administrative Claim on the Effective Date in the amount of any sums which are due and payable as of the date thereof pursuant to that certain Adequate Protection Agreement (the "Fujifilm Adequate Protection Agreement") approved by order of the Bankruptcy Court entered on August 7, 2018 [Docket No. 265], and the Fujifilm Adequate Protection Agreement shall terminate on the Effective Date, except as provided in Article III.A.3.iii of this Plan. For the avoidance of doubt, as of June 20, 2019 six monthly adequate protection payments totaling $54,000.00, plus additional amounts for goods shipped to the Debtor postpetition in the ordinary course of business, were due and payable by the Debtor to Fujifilm pursuant to the Fujifilm Adequate Protection Agreement, which amounts constitute an Allowed Administrative Claim

## ARTICLE III.
## DESIGNATION AND TREATMENT OF CLASSES OF CLAIMS AND CLASSES OF EQUITY INTERESTS

A.   *Designation of and Specification of Impairment and Treatment of Classes of Claims and Classes of Equity Interests*

All Claims and Equity Interests, other than Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to this Plan and pursuant to §§ 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the

extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

NOTWITHSTANDING ANYTHING IN THIS PLAN OR ELSEWHERE TO THE CONTRARY, THE DEBTOR SHALL HAVE THE OPTION TO PREPAY THE SECURED, PRIORITY OR ADMINISTRATIVE CLAIM OF ANY PARTY IN INTEREST WITHOUT PENALTY.

1.    Class 1—Secured Claims of People's United Bank and Peoples Leasing Corp.

a.    *Classification*:  Class 1 consists of People's United Bank's and Peoples Leasing Corp.'s (collectively "People's") Secured Claims against the Debtor.

b.    *Impairment and Voting*:  This Class is impaired under and is entitled to vote on the Plan.

c.    *Treatment*:

i.    Allowance: People's filed Secured Claims No. 2 and 11 in the amount of $2,866,657.88 and $4,457,215.64 respectively (the "People's Secured Claims"). The People's Secured Claims  shall be reduced to and Allowed based on a prior contribution from Kevin Armata in the amount of $250,000.00 and prior payments from a tax refund totaling $645,099.00 previously received by People's and a refinance of the Debtor's assets with the net proceeds from the refinance of the Debtor's assets after paying or reserving for certain expenses as set forth in the Exhibit E attached to the Disclosure Statement, and so that Peoples receives in a best case scenario the sum of $3,004,901 or in a worst case scenario, the sum of $2,653,400 and the balance of the People's  Secured Claims shall be released. The Debtor will continue making adequate protection payments to People's Leasing Corp in accordance with the existing order entered by the Bankruptcy Court until the earlier of the Effective Date or the date the Allowed Secured Claims of People's hasve been satisfied as set forth herein, subject to appropriate proration as of the date People's Allowed Secured Claims have been satisfied.  People's shall waive any Unsecured Claim on the Effective Date.

The allowance and treatment of the Secured Claims of Peoples in the Plan shall be in full and final settlement of all claims that have been asserted by the Committee against People's United Bank in Adversary Proceeding 18-2014 (the "People's Complaint") on the Effective Date, and, upon the exchange of mutual releases by and between People's and the Committee and the waiver of People's Unsecured Claim on the Effective Date, People's Complaint and Adversary Proceeding 18-2014 shall be dismissed with prejudice.

If People's does not waive its Unsecured Claim, nothing in this Plan shall alter or affect the Committee's right and authority to pursue the People's Complaint. ii.  Liens:  People's  shall retain its liens on its Collateral (other than in any refunds from the State of Massachusetts and any accounts receivable due from Toys R Us) to secure the Allowed Secured Claim of People's with the same validity, priority and extent as existed on the Petition Date.

iii.     Payment: Unless paid sooner, People's Allowed Secured Claim will be paid within one week of the Effective Date.  The Debtor anticipates paying off the People's Secured Claim from the proceeds of a refinancing of its assets.  It is anticipated that Armata and his related entities will sign a separate personal note or be responsible for a reduced deficiency to be agreed upon as part of any settlement with People's.  Armata and his related entities have reached a resolution in principal with People's which needs to be finalized prior to Confirmation.  People's is reviewing but has not yet decided if it will accept the treatment of Class 1.

2.     Class 2—Secured Claim of Connecticut Department of Economic and Community Development

a.     *Classification*:  Class 2 consists of the Secured Claim of Connecticut Department of Economic and Community Development ("DECD")

b.     *Impairment and Voting*:  This Class is impaired under the Plan.

c.     *Treatment*:

i. Allowance:  The Secured Claim of the DECD shall be reduced from $1,051,326.64 and Allowed in the amount of $269,651.02, and the balance of the Secured Claim shall be waived, disallowed and expunged as against the Debtor and Armata as of the Confirmation Date, provided, however, that such waiver  , release and discharge is conditioned upon WMG not relocating its business outside the State of Connecticut at any time prior to the date the Allowed Secured Claim of DECD is paid in full, as provided by §2.10 (G) of the Assistance Agreement  between DECD and WMG, fully executed as of March 20, 2009 ("Assistance Agreement No. 1").  In the event this relocation condition does not remain satisfied until the Allowed Secured Claim of DECD in the amount of $269,651.02 is paid in full, the forgiveness credit in the amount of $1,000,000 will automatically be added to the Allowed Secured Claim of DECD, together with a one-time penalty charge of 7.5%, all of which shall be immediately due and payable upon relocation. Any other default including a payment default shall not reinstate the forgiveness credit of $1,000,000.00.

ii.     Liens: The DECD shall retain its liens on its Collateral (other than in any refunds from the State of Massachusetts and any accounts receivable from Toys R US) to secure the Allowed Secured Claim of the DECD with the same validity, priority and extent as existed on the Petition Date, subordinated to the lien of any new lender that extends credit to the Debtor that helps satisfy the Allowed Secured Claim of Peoples.

iii.     Payment: The Allowed Secured Claim of the DECD will be amortized and paid such that DECD receives $5,000.00 per month until January 2020, with the balance of the Allowed Secured Claim to be amortized and paid thereafter, with interest, as provided in the

13

Assistance Agreement No. 1 between the parties. Section 2.10(G) of the Assistance AgreementNo. 1 between the parties will remain enforceable, such that if the Debtor relocates its entire operation out of state, the forgiveness credit in the amount of $1 million will be automatically added to Allowed Secured Claim of the DECD, together with a one-time penalty charge of 7.5% as set forth in the Assistance Agreement No. 1, all of which would be immediately due and payable upon relocation. DECD will also receive written guaranties of payment of its secured and unsecured claims from Armata and entities owned or controlled by Armata that previously guaranteed the DECD Allowed Secured Claims and Unsecured Claims. The Debtor has no present intention of relocation, and even assuming arguendo it would consider it in the future, it will not relocate until all payment obligations under the Plan have been satisfied in full. The Debtor believes this treatment is acceptable to the DECD.

     3.      <u>Class 3—Allowed Secured Claim of Fujifilm North America Corporation</u> ("Fujifilm")

     a.    *Classification*: Class 3 consists of the Allowed Secured Claims of Fujifilm.

     b.    *Impairment and Voting*: This Class is impaired under the Plan.

     c.    i. *Allowance:* Fujifilm filed the following claims:

Claim 31- $611,948.31 (Unsecured)

Claim 32-$548,.568.15 (Secured)

Claim 33-$559,480.12 (Secured)

Fujifilm's two Secured Claims (No. 32-1 and 33-1) shall be reduced to the total amount of $500,000.00 based on an agreement with Fujifilm to avoid the costs and risks of litigation. Consequently, Claim No. 32-1 shall be allowed as a Secured Claim in the amount of $325,000.00 and as an Unsecured Claim in the amount of $223,568.15 and Claim 33-1 shall be allowed as a Secured Claim in the amount of $175,000.00 and an Unsecured Claim in the amount of $384,480.12. The Unsecured Claim of Fujifilm 31-1 in the amount of $611,948.31 shall also be an Allowed Unsecured Unsecured Claim. The Allowed Secured Claims and Allowed Unsecured Claims of Fujifilm shall not be subject to further objection, setoff or dispute.

     ii.    *Liens:* Fujifilm shall retain its liens on its Collateral (other than in any refunds from the State of Massachusetts and any accounts receivable from Toys R Us) to secure the Allowed Secured Claims of Fujifilm with the same validity, priority and extent as existed on the Petition Date. Notwithstanding anything in this Plan to the contrary, Fujifilm shall retain its first-priority liens on two Inca Onset printers and software, accessories, and equipment related thereto (the "Fujifilm Printer Collateral"). Fujifilm's interest in Collateral other than the Fujifilm Printer Collateral shall be subordinated to the lien of any new lender that extends credit to the Debtor that helps satisfy the Allowed Secured Claim of Peoples.

     iii.    *Treatment:* The Allowed Secured Claims of Fujifilm will be amortized over thirty-six (36) months with no interest. The Reorganized Debtor will pay to Fujifilm the sum of Thirteen Thousand Eight Hundred Eighty-Eight and 89/100 Dollars ($13,888.89) per month for thirty-six

(36) months commencing sixty (60) days after the Effective Date in full satisfaction of its Secured Claims. The Debtor or Reorganized Debtor shall continue to make adequate protection payments of $9,000 per month pursuant to the Fujifilm Adequate Protection Agreement until the first month in which Fujifilm is entitled to receive the first Plan payment provided for in this paragraph, which adequate protection payment shall be prorated for the month in which the Plan payments commence. Except with respect to the $9,000 monthly adequate protection payments provided for in the preceding sentence, on the Effective Date the Fujifilm Adequate Protection Agreement shall terminate and the respective obligations of the Debtor and Fujifilm thereunder shall cease. In the event of a default by the Reorganized Debtor on the Plan payments of Fujifilm's Allowed Secured Claims, which default remains uncured for fifteen (15) days following receipt of written notice of default from Fujifilm, the Reorganized Debtor shall make the Fujifilm Printer Collateral available to Fujifilm upon request pursuant to Section 9-609(c) of the Uniform Commercial Code and Fujifilm will be entitled to pursue any outstanding balance of its Allowed Secured Claims as modified by the Plan against the Reorganized Debtor. The Debtor believes this treatment is acceptable to Fujifilm.

4.    Class 4—Secured Claims of Agfa, Corporation ("Agfa")

a.    *Classification*: Class 4 consists of the Secured Claims of Agfa.

b.    *Impairment and Voting*: This Class is impaired under and is entitled to vote on the Plan.

c.    *Treatment*: Agfa will retain its liens on the equipment securing the Secured Claim of Agfa. Agfa has filed two proofs of claim (Proof of Claim No. 58-1 and 58-2), and the Debtor believes Claim No. 58-1 is essentially a duplicate of 58-2 and will object to Claim No. 58-1 if not withdrawn and reserves the right to object to the Secured Claims of Agfa if the treatment under the Plan is not accepted.

The Allowed Secured Claim of Agfa shall be reduced from $491,795.05 and fixed and allowed in the amount of $325,000 ("Agfa's Allowed Claim"), which amount shall be paid by the Debtor or Reorganized Debtor, as the case may be, by and through Agfa setting off against the outstanding balance of Agfa's Allowed Claim any rebates earned by the Debtor/Reorganized Debtor under that certain Agfa Long Term Equipment Rebate Agreement, effective as of August 1, 2015 (the "Rebate Agreement") and that certain Purchase and Supply Agreement, effective August 1, 2015 (the "Purchase and Supply Agreement"), each as amended pursuant to "Amendment 1 to Purchase and Supply Agreement and Long-Term Equipment Rebate Agreement" (The Rebate Agreement and the Purchase and Supply Agreement are hereinafter referred to collectively, as amended, the "Agfa Agreements"). The Agfa Agreements shall be assumed by the Debtor and vested in the Reorganized Debtor, pursuant to Section 365 of the Bankruptcy Code; provided, however, that except as otherwise set forth in this Plan or the Plan Confirmation Order, the Reorganized Debtor's obligations to Agfa under the Agfa Agreements shall be non-recourse.

5.    Class 5—Allowed Priority Non-Tax Claims

a.      *Classification*:  Class 5 consists of any and all unpaid Allowed Priority Non-Tax Claims against the Debtor.  The Debtor does not presently believe there are any Allowed Priority Non-Tax Claims.

b.      *Impairment and Voting*:  This Class is not impaired under and is conclusively presumed to have accepted the Plan, and the Debtor are not required to solicit acceptances from any holders of Claims in this Class.

c.      *Treatment*: On the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each Entity holding an Allowed Priority Non-Tax Claim against will receive Cash equal to the Allowed amount of such Priority Non-Tax Claim, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtor prior to the Effective Date and except to the extent that such holder agrees to less favorable treatment.

6.      <u>Class 6—Allowed Unsecured Non-Priority Claims Against the Debtor</u>

a.      *Classification*:  Class 6 consists of Allowed Unsecured Claims against the Debtor.

b.      *Impairment and Voting*:  This Class is impaired under and is entitled to vote on the Plan.

c.      *Treatment*: Without waiving its rights to object to other Claims and reserving the right to object to certain Unsecured Claims as noted in treatment of certain related Secured Claims (e.g. Agfa), the Debtor has recently amended its Schedules to delete the claims of certain Creditors for the reasons set forth on Exhibit D attached to the Disclosure Statement.

The Debtor presently anticipates that after amending its Schedules and conforming deficiency claims from Secured Claims (and the waiver of any Unsecured Claims by People's on the Effective Date), that Allowed Non-Priority Unsecured Claims will total approximately $9 million.

Holders of Class 6 Claims shall receive, in full, complete and final satisfaction and release of their Allowed Unsecured Claims, the following:  Holders of Allowed Unsecured Claims in Class 6 shall receive their Pro Rata share of  a quarterly payment in the amount of $53,571.42 paid each quarter (the "Quarterly Payments") by the Reorganized Debtor to the Creditor Representative for a total of twenty-eight (28) quarters (i.e. the 28 quarters equates to a period of seven years) commencing six months after the Effective Date of the Plan (the "Payment Start Date").  The Creditor Representative shall hold each Quarterly Paymentfor the benefit of holders of Allowed Class 6 Unsecured Claims and shall issue one annual distribution check to holders of Allowed Unsecured Claims in Class 6. The Reorganized Debtor reserves the right to prepay any of these Quarterly Payments to the Creditor Representative for distribution to the creditors in this class under the Plan without penalty. The Reorganized Debtor reserves the right to review and if it deems appropriate, to object, contest or otherwise challenge any claim that has not previously been allowed by Bankruptcy Court Order in the time frame set forth herein and subject to the rights of the Creditor Representative set forth in Article IV.J.A of theis Plan. The deadline to file such objection or challenge is July 9, 2019, subject to the rights of the Debtor, the Committee or the Creditor Representative, as applicable, to seek a further extension of the deadline to file objections

to claims. The total payout to holders of Allowed Unsecured Claims in Class 6 shall not exceed $1,500,000.00 in the aggregate and there shall be no interest that accrues on any distributions to Class 6 holders. Presently, the Debtor anticipates objecting to the claim of the Town of Suffield.

      7.    <u>Class 7—Equity Interests</u>

      a.    *Classification*: Class 7 consists of Equity Interests in the Debtor.

      b.    *Impairment and Voting*: This Class is impaired under and is entitled to vote on the Plan. The holder of interests in this class is making substantial contributions toward confirmation, including but not limited to the waiver of a partial but substantial arrearage claim on the lease of the business property and the recent cash infusion in the amount of $250,000.00 paid to People's. In addition, Mr. Armata has an scheduled Unsecured Claim of $179,925.76 and owns Armata Realty, LLC which has a scheduled Unsecured Claim of $462,385.90. MRP is the wholly owned entity which leases the business premises and is owed many hundreds of thousands of dollars, and as part of the settlement with the Committee and the Debtor, there will be no distribution on these claims from the Debtor to MRP as part of Mr. Armata's contribution to the Plan and Debtor other than such amounts as are necessary to cure an arrearage owed to the First National Bank of Suffield nka PeoplesBank ("FNB") up to the Lease Cap Amount. FNB has provided reinstatement information to the Debtor supporting a balance due of approximately $470,000.00 as of May 2019.For the avoidance of doubt, (i) neither Kevin Armata, MRP, Armata Realty, LLC or any other entity owned or controlled by Kevin Armata or any insider of Kevin Armata will share in or receive any distribution from the Class 6 Unsecured Claims funds, and (ii) no payments (other than lease payments, wages, benefits and reimbursement of expenses) shall be made to Kevin Armata, MRP, Armata Realty LLC or any other entity owned or controlled by Kevin Armata or any insider of Kevin Armata in excess of the Lease Cap Amount unless and until all Quarterly Payments to the Creditor Representative on behalf of holders of Class 6 Claims are paid in full.

      c.    *Treatment*: The holder of Equity Interests in the Debtor shall retain his Equity Interests.

*C.*    *Special Provision Governing Unimpaired Claims*

      Nothing under the Plan shall affect the Debtor's rights in respect of any Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Claims.

*D.*    *Confirmation Pursuant to § 1129(b) of the Bankruptcy Code*

      The Debtor shall seek Confirmation of the Plan pursuant to § 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests. The Debtor reserves the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to § 1129(b) of the Bankruptcy Code requires modification.

*E.*    *Elimination of Vacant Classes*

      Any Class of Claims or Equity Interests that does not have a holder of an Allowed Claim or Allowed Equity Interest or a Claim or Equity Interest temporarily Allowed by the Court as of

the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to § 1129(a)(8) of the Bankruptcy Code.

F.    *Settlement with the DECD on Unsecured Claim*

The Debtor has provided the DECD with a job audit demonstrating that it is entitled to a forgiveness credit in the amount of $750,000.00 pursuant to the Assistance Agreement between the DECD and WMG, fully executed as of March 27, 2015 ("Assistance Agreement No. 2") and the DECD has reviewed that job audit and confirmed that it satisfies the jobs requirements of Assistance Agreement No. 2 entitling the Debtor to the forgiveness credit in the amount of $750,000.00, but that entitlement to the credit is subject to DECD's approval and support of the Plan. Accordingly, and notwithstanding Unsecured Proof of Claim No. 39-2 filed by the DECD to the contrary, Unsecured Claim 39-2 of the DECD is reduced to and allowed in the amount of $750,000.00 as of the Effective Date, and the remaining balance is waived, released and discharged as to the Debtor and Armata, provided, however, that such waiver, release and discharge is conditioned upon: (1)  WMG and MRP remaining in compliance with their payment obligations in this Subpart F, (2) WMG retaining at all times no less than a percentage being negotiated with the DECD (that will not exceed sixty five (65%) percent based on  the number of full-time employment positions  it reported to the DECD it had as of March 15, 2019 based on a rolling 12 month average, which requirement shall be applicable  until the  date on which the DECD receives $750,000.00 based on its distributions in Class 6 under the Plan and from MRP pursuant to Assistance Agreement No. 2, plus applicable interest  under Assistance Agreement No. 2, or if there is an uncured default as set forth in this Subpart F, the additional sum of $750,000.00 based on its distributions in Class 6 under the Plan and from MRP pursuant to Assistance Agreement No. 2, and (3) WMG not relocating its business outside the State of Connecticut before the payment obligations on account of DECD's Unsecured Claim as supplemented with the payments required to be made by MRP to DECD pursuant to this Subpart F, have been fully satisfied., which requirement shall be applicable only until the date on which the DECD Unsecured Claim is paid in full  If either condition (1), (2) or (3) above are not at all times satisfied during the time period while payments are to be made to DECD, the forgiveness credit shall be retracted and the Unsecured Claim of DECD shall correspondingly be increased, only upon issuance of a written notice of default to WMG and the Creditor Representative which remains uncured after a period of 30 days from the date of receipt of such notice.  In the event that the forgiveness credit in the amount of $750,000 shall be reinstated and the Allowed Unsecured Claim of DECD shall be correspondingly decreased upon the cure of all defaults then existing under this Subpart F. For the avoidance of doubt, the cure of any payment default shall require the payment to DECD of all amounts then due to DECD under this Subpart F as of the date of such payment.  The Allowed Unsecured Claim and the Allowed Secured Claim of the DECD are and will continue to be secured by a mortgage on the Premises leased by the Debtor from MRP.

MRP will pay the DECDan amount equal to the difference between the quarterly plan payments DECD will receive from the Debtor and the amount of the monthly payments that would be required under Assistance Agreement No. 2 between the parties on a re-amortized debt in the amount of $750,000. The personal obligation of Armata and MRP for these payments will be documented by a promissory note from Armata and/or MRP to the DECD.

The DECD's mortgages on 100 Marketing Research Drive will be modified to correspond to the restated treatment of DECD's Allowed Secured Claim and Allowed Unsecured Claim, with the understanding that the restated principal balance of the second mortgage will be comprised of the full amount of the reduced Secured Claim ($269,651.02) subject to increase as set forth in the section on treatment of the Allowed Secured Claim of DECD and the third mortgage restated and reduced to the full amount of the allowed Unsecured Claim ($750,000), subject to increase in the event of a relocation or the occurrence of other conditions as set forth herein; and that the modified mortgages would retain their current priority position. Armata has agreed to reaffirm his existing personal guarantees of WMG's indebtedness to DECD, as modified, or execute new ones.

The allowance and treatment of the Secured Claims and Unsecured Claims of the DECD in this Plan shall be in full and final settlement of all claims that have been asserted against the DECD by the Committee in Adversary Proceeding 18-2020 (the "DECD Complaint") and upon the Effective Date the DECD Complaint shall be dismissed with prejudice on the Effective Date. The Committee objects to any dismissal of the DECD Complaint through the Plan unless and until there is a resolution of the issues raised by the Committee in the DECD Complaint and clarification of all open issues raised by the Committee with the proposed settlement of DECD's Unsecured Claim.

G.    *Settlement with Committee*

The following summarizes a settlement reached with the Committee, the Debtor, Armata and insiders of the Debtor affiliated with Kevin Armata in addition to the treatment of Class 6 Claims in the Plan.  This settlement includes a complete release of all preference claims and Avoidance Actions the Debtor may have against trade creditorson the Effective Date and a conditional general release of Armata, MRP and all related Insiders of the Debtor and Armata from all actions including Avoidance Actions that will become effective approximately 3.5 years after Quarterly Plan payments commence toholders of Allowed Claims in  Class 6 as set forth in greater detail below:

1. Upon the Effective Date, all preference claims and Avoidance Actions against all parties other than Kevin Armata and the Debtor's and Armata's insiders and affiliates including the Debtor's landlord, MRP and Armata Realty LLC (collectively, the "Insiders") shall be released and waived without any further action by the Debtor or the Reorganized Debtor.  The preference actions that are not being released against the Insiders, as well as all other avoidance actions under chapter 5 of the  Bankruptcy Code against those same Insiders (collectively, the "Insider Claims") may be prosecuted by the Creditor Representative or Chapter 7 Trustee, as applicable.  For the avoidance of doubt, no Insider Claims will be brought by the Creditor Representative or Chapter 7 Trustee unless the Reorganized Debtor defaults on the payment of any Quarterly Payments to the Creditor Representative on behalf of Class 6 General Unsecured Creditors under the Plan and any such default remains uncured beyond any applicable cure period subject to the terms set forth in Paragraph G. 2. of Article III of this Plan. The Debtor has not taken into consideration new value, contemporaneous exchange or other defenses which it believes would substantially reduce the total amount of potential preference liability, but there are approximately $5,360,000.00 in transactions that occurred in the ninety days prior to the bankruptcy filing, including payroll expenses of approximately $1.9 million.

2. The Debtor shall issue a general release of Armata and all related Insider entities and individuals from all causes of actions or claims of any kind, but such releases under the Plan (whether termed as exculpation, indemnification, release of preferences or other avoidance actions, or otherwise (for avoidance of doubt, including releases for preference claims for the Insiders) shall not become effective untilthe three and one half (3.5) year anniversary of the Payment Start Date except as set forth in this paragraph. Releases for the Insiders, Armata and the Debtor's and Armata's Insiders and affiliates including MRP are contingent on the Reorganized Debtor making all Quarterly Payments to the Creditor Representative on behalf of holders of Allowed Class 6 Claims that are due to be paid during this 3.5 year period after the Payment Start Date. If the Reorganized Debtor has not timely made all payments due during this 3.5 year period, the releases for the Insiders will not become effective until the first date upon which the Reorganized Debtor cures any and all existing payment defaults to the Creditor Representative for the benefit of the holders of Allowed Claims in Class 6 creditors and becomes current on all payments then due to Class 6 creditors as of such date.  All applicable statutes of limitation, etc. for these Insiders shall be automatically tolled commencing upon the filing of an amended plan containing the terms of this settlement and all Insider parties/entities subject to the conditional delayed release consent to the tolling of all applicable statutes of limitation and shall execute tolling agreements if requested by the Creditors' Committee or the Creditor Representative, as applicable.  The form of release contemplated herein shall be filed on the docket and with the Court no less than ten (10) days prior to the Voting Deadline.

a. The Insiders waive their right to any distributions on account of their claims against the Debtor and/or its estate other than the post-petition arrearage owed to FNB as of the Effective Date, which distributions to MRP on account of the FNB arrearage shall be capped at $358,000.00 (the "Lease Cap Amount").  MRP will remain current with FNB going forward and with respect to any existing arrearage owed to FNB as of the date the Plan was executed, and will not seek any additional contributions from the Debtor or Reorganized Debtor as part of its cure that exceed such $358,000.00 Lease Cap Amount, provided however, that such Lease Cap Amount shall not limit or otherwise effect any other regular monthly obligation owed by the Debtor or Reorganized Debtor to or for the benefit of MRP in accordance with its lease of real property with the Debtor and Reorganized Debtor as modified herein and subject to the limitations set forth in paragraphs 5 and 6 below.

4.  With respect to Armata's salary:

(a)    Armata will receive a minimum annual gross salary of $175,000.00 as his exclusive compensation (not including any normal and customary benefits, e.g., health, etc.) from the Reorganized Debtor.

(b)    Upon the occurrence of the Effective Date, Armata's salary will increase to $250,000.00 (not including any normal and customary benefits. e.g. health, etc.) from the Debtor, subject to certain withholding/clawback provisions, as follows:

i.    For the period between the Effective Date and the completion of payment of all Administrative Claims for  Professionals Fees as set forth in the Plan, if the Reorganized Debtor does not make one or more required payments to such Administrative claimants, his annual salary shall be reduced to $175,000.00 until all such missed Plan payments are made.  Once all such

missed Plan payments are made, Armata can recoup the unpaid portion of the increased salary; and

  ii.  In addition to the foregoing provisions with respect to certain Administrative creditors, for the period between the Payment Start Date and the completion of payment of all amounts to be paid to Class 6 creditors under this Plan, if the Reorganized Debtor does not make one or more required payments to Class 6 creditors, Armata's annual salary shall be reduced to $175,000.00 until all such missed Plan payments are made. Once all such missed Plan payments are made, Armata can recoup the unpaid portion of the increased salary.

  (c) Armata's annual salary is capped at $250,000.00 (subject to the reductions and time frames set forth this this paragraph). Upon the effectiveness of the releases set forth in paragraph G.2 of theis Article III, the $250,000.00 annual salary cap is eliminated. However, Armata's annual salary shall be reduced to $175,000.00 if the Reorganized Debtor does not make the remaining Quarterly Plan payments to holders ofAllowed Class 6 Claims and holders of Professional Fees until all such payments are made. Once all missed Plan payments are made by the Debtor, Armata can recoup the unpaid portion of the increased salary.

  5. Subject to this subparagraph and the next subparagraph, the rent paid to MRP is reduced to $100,000.00 per month until all payments to Holders of Allowed Class 6 Claimants and Professional Fees under the Plan are completed. Notwithstanding the foregoing, the base rent of $100,000.00 rent will be increased by the amount of any real estate tax increases or mortgage interest rate increases to MRP, which are supported by documentation reflecting the increase that is provided to the Creditor Representative prior to implementing any such rent increase.

  6. Upon the effectiveness of the releases to the Insiders as set forth in paragraph G.2 of this Article, the monthly rent paid to MRP may be increased by 4% per year. However, if the Quarterly Payments under the Plan and other Plan payments are not made by the Reorganized Debtor to the Creditor Representative for the benefit of holders of Class 6 Claims and holders of Professional Fees as provided for under this Plan, the 4% escalation shall be suspended until the Reorganized Debtor makes all missed payments and becomes current on Plan payments to such creditors. Once all such missed Plan payments are made, Armata can recoup the unpaid portion of the increased rent and the additional rent percentage escalation suspension set forth in this subparagraph shall cease.

  7. The Confirmation Order will specifically provide that, notwithstanding whether the Debtor's lease with MRP is assumed, all claims against MRP are preserved and shall not be barred, limited, or otherwise affected by any assumption of the lease. For the avoidance of doubt, all defenses MRP could assert against any such claims will be similarly preserved and all defenses of any insider or affiliate not receiving or waiving a distribution under the Plan are similarly preserved.

  8. The Committee will have input on the Claims objection process, including the decision to bring, not to bring, and to settle Claim objections. The Confirmation Order will provide that the Committee has standing and may file a motion challenging the Debtor with respect to any Claim objection, proposed settlement, or failure to bring a claim objection and may file its own objection, to the extent necessary. The Committee shall remain in existence, with counsel and right to

payment for its counsel from the Reorganized Debtor, until resolution and completion of the Claims reconciliation and objection process.

9. The Debtor and/or the Reorganized Debtor shall fund an escrow account in the amount of $25,000 which shall be available to the Committee or Creditor Representative, as applicable, to enforce the rights of holders of Class 6 Claims, including retention of professionals, in the event of the Reorganized Debtor's default under the terms of the Plan. The Reorganized Debtor shall fund the escrow starting nine months from the Effective Date in the amount of $5,000.00 per month for five months ($25,000.00 total). The escrow amount of $25,000.00 shall not constitute a cap on fees and expenses incurred by the Committee or the Creditor Representative.

10. The Debtor shall promptly provide the Committee or the Creditor's Representative, as applicable, with quarterly financial reports. Financial reports shall be provided only to the Creditor Representative, subject to a mutually acceptable confidentiality agreement.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Debtor's Actions*

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, and the Reorganized Debtor shall be authorized and directed to take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

B.    *Sources of Consideration for Plan Distributions*

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtor to make payments required pursuant to the Plan will be obtained from the Reorganized Debtor's Cash balances, including Cash from operations, from financing or other capital investment to be obtained by the Debtor, and from net proceeds from the sale of any assets of the Reorganized Debtor and the remaining balance of an escrow account holding the proceeds of a federal tax refund subject to the lien of Peoples of approximately $325,000.00 (which is net of the remaining balance of a prior carveout to counsel to the Committee). In particular, the Debtor anticipates refinancing or factoring its accounts receivable and equipment and giving the new lender a first priority lien on its assets. As the Debtor does not yet know the amount of its current receivables as of the Effective Date and it is waiting for its equipment lender to do their inspection, the Debtor does not yet know the available proceeds from its intended refinance but is hoping it will exceed $3.3 million.

The Debtor has received approval from a disinterested third party commercial lender's loan committee (the "A/R Lender") to lend funds to the Debtor based on the Debtor's current accounts receivable at closing and is in the process of scheduling an inspection with a third party commercial lender ("the M&E Lender") willing to lend money based on the value of the Debtor's machinery and equipment (presently the amount of the asset based loan is anticipated to be approximately $2 million). The M&E Lender previously gave approval for the loan in 2018, but requires a physical inspection and evaluation of the collateral and the Debtor no more than 60 days prior to the closing

22

to reapprove and close the loan, and this process is now underway. The Debtor's proposed M&E Lender and the A/R Lender are working in tandem to help finance the Debtor. The Debtor will file a copy of the proposed loan documents (or copies that are in material form consistent with the anticipated final version) as a Plan supplement no later than seven (7) days prior to Confirmation Hearing or the date it receives them from the M&E Lender and the A/R Leader.

Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtor. Once the new lenders are in place, the Reorganized Debtor will fund operations primarily from receiving 85% of its new accounts receivables versus from its collections as it had been doing during the chapter 11. This increase in the availability of funds will allow the Reorganized Debtorto purchase materials more quickly and thereby grow its business quickly to help fund the Plan.

C.      *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, the Debtor shall continue to exist after the Effective Date as a separate legal entity, with all the powers of a corporation or limited liability company, as the case may be, pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

D.      *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property of the Debtor's estate shall vest with the Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.      *Amendment of Existing Agreements and Other Corporate Actions by the Debtor*

On and after the Confirmation Date the Debtor shall take any and all other corporate actions necessary to effectuate the terms of the Plan. Each of the officers of the Debtor is authorized and directed to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

F.      *Directors and Officers of the Reorganized Debtor*

Kevin Armata is the sole legal officer and director of the Debtor. There are four other individuals employed by the Debtor that hold the following titles: Vice-President of Manufacturing, Vice-President of Customer Service, Vice-President of Finance and Executive

Vice-President.  However, these individuals do not have any formal role or participation in corporate governance.  Thus, the Debtor does not view these individuals as officers, only Donna Kirkorian is related to Kevin Armata, her husband.  Her salary is approximately $135,000.00 per year.  On the Effective Date, Kevin Armata shall remain the sole officer and director of the Reorganized Debtor.  *Exemption from Certain Taxes and Fees*

G.  Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant to this Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.  Such exemption under § 1146(a) of the Bankruptcy Code specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien, or other security interest; (2) the making or assignment of any lease or sublease; (3) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any transfer occurring under the Plan.

H.  *Preservation of Causes of Action*

In accordance with § 1123(b) of the Bankruptcy Code, but subject in all respects to Article IX of the Plan, and as otherwise may be set forth in the Plan, the Reorganized Debtor or the Creditor Representative, as applicable shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, (other than Insider Avoidance Actions which may only be pursued by the Creditor Representative),  whether arising before or after the Petition Date against Insiders of the Debtor, Armata and Insiders of Armata in accordance with and the time set forth in the Plan and claims against Afga regarding its claim and lien, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, provided however, that all Avoidance Actions against trade creditors shall be irrevocably waived and released on the Effective Date and the Reorganized Debtor shall have no rights to commence or pursue any such claims  The Reorganized Debtor retains the right to pursue any causes of action regarding the enforceability of US Trustee fees, including the constitutionality of the statue increasing the amounts otherwise due.  The Creditor Representative may pursue such Causes of Action against Insiders of the Debtor, Armata and Insiders of Armata, as appropriate, in accordance with the best interests of the Reorganized Debtor but only in accordance with the Plan, after a default by the Reorganized Debtor regarding payment to Class 6 Claims and holders of Professional Fees beyond any applicable cure period and provided that the Reorganized Debtor has not subsequently cured any such default.  At this time, the Debtor is not presently aware of any intention to pursue other claims. The Debtor specifically reserves the right to pursue Avoidance Actions against holders of Class 6 Claims, but any such Avoidance Actions claims against holders of Class 6 Claims shall waivebe d and irrevocably released without further action of the Debtor or the Reorganzied Debtor on the Effective Date.  Any claims against Agfa shall be retained and include all claims regarding its Secured and Unsecured Claims and lien including Avoidance Actions to the extent it does not accept its treatment under the Plan.  No

Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Causes of Action against it as any indication that the Debtor, the Reorganized Debtor or the Creditor Representative as applicable, will not pursue any and all available Causes of Action against it.  The Debtor, the Reorganized Debtor, or the Creditor Representative, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, the Debtor, Reorganized Debtor, or Creditor Representative as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of this Plan.  Except as expressly provided to the contrary in theis Plan, including with respect to the provisions set forth in Article IX of this Plan, the Reorganized Debtor reserves and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or unexpired lease during the Chapter 11 Case or pursuant to the Plan.  In accordance with § 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action other than (i) Avoidance Actions against Insiders, Armata or Insiders of Armata which may be brought by the Creditor Representative, and (ii) Avoidance Actions against trade creditors which shall be waived and released on the Effective Date.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action (other than Insider Avoidance Actions which may be brought by the Creditor Representative), and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

I.      *Financing*

The Debtor intends to obtain financing to satisfy the Secured Claims of Peoples on or around the Effective Date.  This financing shall require the potential lender to obtain a first priority lien on all the Debtor's Assets (other than the Fujifilm Printer Collateral and certain equipment of Agfa), , any amount due from Toys R Us and any tax refund or related proceeds of a tax refund from the State of Massachusetts.   Entry of the Confirmation Order shall entitle any lenders that are willing to and actually provide financing to the Debtor in an amount that is sufficient, when combined with other funds on hand, to satisfy the Allowed Secured Claims of Peoples Bank as set forth in the Plan and the Court will enter such orders as are necessary to memorialize such first priority liens on those Assets superior to all other Liens held by any other lienholder.

J.      *Creditor Representative*

a.      Appointment.  On or before the Confirmation Date, the Committee shall select an individual to act as the Creditor Representative, as well as an alternate, and shall disclose the identity of the Creditor Representative and the alternate to the Debtor and the Court prior to the Confirmation Hearing. The Creditor Representative may retain counsel as necessary to enforce

its rights in the event of a default by the Debtor or Reorganized Debtor under the Plan. Upon the dissolution of the Committee, the Creditor Representative shall be appointed subject to approval by the Court.

b.  Duties. The Creditor Representative shall be authorized and empowered to (1) pursue the Debtor's compliance with the terms of the Plan in the event of a default after giving the Debtor fourteen (14) business days to cure any default and (2) exercise all of the powers of the Debtor in connection with the Avoidance Actions against any Insider of the Debtor, Armata or Insider of Armata. In all circumstances, the Creditor Representative shall act in the best interests of the holders of Allowed Unsecured Claims. The Creditor Representative or his/her agent shall maintain books and records containing an accounting of receipts and disbursements. The Creditor Representative may retain counsel in the event of a default by the Reorganized Debtor under the Plan.

c.  Compensation. The Creditor Representative shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, but any services associated with monitoring the Debtor's performance under the Plan or administering payments under the Plan shall not be  by the Debtor, but come from and reduce the quarterly payments otherwise payable to the holders of Allowed Unsecured Claims in Class 6. In the event of a default by the Reorganized Debtor under the Plan, the Creditor Representative shall be entitled to the reimbursement by the Reorganized Debtor of the Creditor Representative's fees and costs, including reasonable attorneys' fees, incurred in enforcing its rights. Any reasonable fees and/or costs incurred by the Creditor Representative in enforcing its rights upon a default by the Reorganized Debtor under the Plan, including reasonable attorneys' fees, must be paid in full by the Reorganized Debtor before such default will be deemed to be cured.

d.  Resignation and Replacement. The Creditor Representative may resign by giving written notice of resignation to the Reorganized Debtor and the alternate. Within forty-five days of such resignation becoming effective, the Creditor Representative shall provide a final accounting to the Reorganized Debtor and the alternate and will thereupon be discharged from the performance of any further duties. The Creditor Representative may only be removed for cause by the Bankruptcy Court after notice and hearing. Upon the resignation or removal of the Creditor Representative, the alternate Creditor Representative selected by the Creditors' Committee prior to the Confirmation Hearing and approved by the Bankruptcy Court at Confirmation shall serve as the Creditor Representative.

e.  Conflicts. If any claim, cause of action, objection, settlement or other act of, or on behalf of, the Debtor gives rise to a conflict on behalf of the Creditor Representative, the Creditor Representative shall inform the Reorganized Debtor of the conflict not later than two (2) Business Days from discovery of the conflict by the Creditor Representative. Immediately upon discovery of the conflict by the Creditor Representative, the Creditor Representative shall withdraw from any and all involvement concerning the matter or issue giving rise to the conflict, and shall notify the alternate  to serve as the Creditor Representative with respect to such matter or issue.

     f.     Discharge.  After the earlier of the payment of Allowed Unsecured Claims pursuant to the Plan or all of its duties under the Plan have been fully performed, the Creditor Representative shall be discharged of his/her duties.

# ARTICLE V.
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.     Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or unexpired leases set forth on an exhibit (the Assumption Exhibit") will be deemed assumed by the Reorganized Debtor in accordance with the provisions and requirements of §§ 365 and 1123 of the Bankruptcy Code, other than: (1) those that are identified on a schedule of rejected Executory Contracts and unexpired leases filed with the Bankruptcy Court within thirty (30) days of the Effective Date; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or unexpired leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or unexpired lease pursuant to which the requested effective date of such rejection is after the Effective Date.  Entry of the Confirmation Order shall constitute a Court order approving the assumptions or rejections of such Executory Contracts or unexpired leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and unexpired leases, pursuant to §§ 365(a) and 1123 of the Bankruptcy Code.  To the extent there are any defaults in the any Executory Contracts, the Debtor will state the amount of the cure in the Assumption Exhibit.  The Debtor does not presently anticipate any substantial increase in the total amount of Unsecured Claims as a result of any rejection of any leases or Executory Contracts. Unless otherwise indicated, assumptions or rejections of Executory Contracts and unexpired leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or unexpired lease assumed pursuant to the Plan or by Court order shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or unexpired leases pending on the Effective Date shall be subject to approval by a Final Order of the Court on or after the Effective Date.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or unexpired lease or to exercise any other default-related rights with respect thereto.  The Debtor will serve notice of its intent to assume any Executory Contract or unexpired lease at least 21 days before it intends to assume the contract and will serve such notices prior to the Confirmation Hearing.

Assumption of Lease:  The Debtor's principal place of business is located at property commonly referred to as 100 Marketing Drive, Suffield, CT (the "Premises"). The Debtor is the tenant under a lease of the Premises dated April 28, 2005, as amended by Amendment to Lease dated January 8, 2009, Amendment to Lease dated March 10, 2015, and Amendment to Lease

dated March 29, 2016, Amendment to Lease dated April 1, 2016 (collectively, the "Lease") from Marketing Research Park, LLC (the "Landlord" or "MRP"), an entity which is owned by Kevin Armata, the principal of the Debtor. The Debtor has negotiated a reduced rental obligation for the Premises of $100,000.00 per month beginning as of May 2019. This monthly rental obligation to MRP owed by the Debtor is in addition to the Lease Cap Amount that Reorganized Debtor is to pay to cure any mortgage arrearage owed to First National Bank of Suffield Bank aka Peoples Bank ("FNB") as noted below.   During the course of the bankruptcy case, the Debtor negotiated an arrangement wherein it paid less than the monthly rent due under the lease (approximately $130,000 per month) to further the reorganization effort, but the Debtor still was responsible to pay the balance. In some months the Debtor did not make sufficient rent payments to MRP or its agent Armata Realty, LLC.  As a result, the Debtor owes post-petition rent arrears that are in excess of $470,000.00 as of May 2019.  As of May 2019, FNB asserts that is owed no less than approximately $470,000.00 in delinquent mortgage obligations.  MRP and its agent, Armata Realty LLC, will waive any distribution from the Debtor on the rent arrearage except for amounts sufficient to satisfy FNB and an agreement has been reached for the Debtor or Reorganized Debtor to pay any outstanding arrearage owed to FNB and other payments in the approximate amount of $130,000 over the last two weeks of June and the month in July with an additional sum of $130,000 being paid from the refinance that will pay out People's Bank following the Effective Date.  Additional payments will be made after the Effective Date in equal monthly installments over a six month period up to the Lease Cap Amount of $358,000, the total of which shall be deemed the cure amount the Debtor must pay to reinstate the Lease (and as noted, is in addition to regular monthly lease payments as set forth in this paragraph).

Upon the Effective Date, the Debtor shall be deemed to have assumed the Lease with MRP as modified as set forth above and in the Settlement with the Committee as set forth herein.

B.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or unexpired leases, if any, must be filed with the Court within thirty (30) days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection.  Any Claims arising from the rejection of an Executory Contract or unexpired lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtor, the Reorganized Debtor, the Estate, or property of the foregoing parties, without the need for any objection by the Debtor or the Reorganized Debtor, as applicable, or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  Claims arising from the rejection of the Debtor' Executory Contracts or unexpired leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.A.12 of the Plan, as applicable.  The Debtor will serve notice on all parties to Executory Contracts or Unexpired Leases that the Debtor intends to reject Executory Contracts or Unexpired Leases no later than 30 days prior to the Confirmation Hearing.

C.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or unexpired lease, as reflected on the Cure Notice shall be satisfied, pursuant to § 365(b) (1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or as soon as reasonably practicable thereafter or as set forth on the Assumption Exhibit, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or unexpired leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default; (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of § 365 of the Bankruptcy Code) under the Executory Contract or unexpired lease to be assumed; or (3) any other matter pertaining to assumption, the cure payments required by § 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.   The Debtor will include in its notice of intent to assume any Executory Contract or, unexpired lease Cure  notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties.   The notice will give parties no less than 21 days from mailing or Filing to review the proposed assumption and Cure amounts and any objection by a counterparty to an Executory Contract or unexpired lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtor Prior to the deadline set forth in the notice to be determined by the debtor.  Any counterparty to an Executory Contract or unexpired lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.  Notwithstanding anything herein to the contrary, in the event that any Executory Contract or unexpired lease is removed from the Schedule of Rejected Executory Contracts and unexpired leases after such 21-day deadline, a Cure Notice of proposed assumption and proposed amounts of Cure Claims with respect to such Executory Contract or unexpired lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or unexpired lease can be assumed. In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or unexpired lease is greater than the amount set forth in the applicable Cure Notice, the Debtor or Reorganized Debtor, as applicable, will have the right to add such Executory Contract or Unexpired lease to the Schedule of Rejected Executory Contracts and unexpired leases, in which case such Executory Contract or unexpired lease will be deemed rejected as the Effective Date.  Assumption of any Executory Contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or unexpired lease at any time before the date that the Debtor assume such Executory Contract or unexpired lease.  Any Proofs of Claim Filed with respect to an Executory Contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

D.    *Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired leases*

The Debtor reserve its right to assert that rejection or repudiation of any Executory Contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor under such contracts or leases.  Notwithstanding any non-bankruptcy law to the contrary, the Debtor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the

contracting Debtor from counterparties to rejected or repudiated Executory Contracts or unexpired leases.

E.       **Exculpation**

**Except as otherwise provided in the Confirmation Order the Creditors' Committee, its members, and any employees, agents or professionals retained by each committee member, Neubert Pepe & Monteith PC, Lowenstein Sandler LLP, BlumShapiro & Co., P.C., TrueNorth Capital Partners LLC, Tactical Solutions, LLC and Zeisler & Zeisler, P.C. and any individual employed by any of the preceding entities (the "Exculpated Parties"), or any direct or indirect predecessor in interest to any of the foregoing persons, shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Case, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from the fraud, willful misconduct, gross negligence or legal or accounting malpractice of any such party. The rights granted hereunder are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under § 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.**

F.       *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or unexpired lease, and Executory Contracts and unexpired leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and unexpired leases that have been executed by the Debtor

during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or unexpired lease on the Schedule of Rejected Executory Contracts and unexpired leases, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or unexpired lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, or, after the Effective Date, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

H.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to § 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Distributions – Generally*

The Reorganized Debtor will make all distributions required by the Plan.  The Creditor Representative shall make all distributions to holders of Allowed Class 6 Claims of General Unsecured Creditors.

B.    *Distributions of Cash*

Any payment of Cash made by Reorganized Debtor pursuant to the Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

C.    *Distributions Free and Clear*

Except as otherwise provided herein, any distributions or transfers by or on behalf of the Debtor under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, shall be free and clear of any liens, claims, and encumbrances, and no other entity shall have any interest — legal, beneficial, or otherwise — in assets transferred pursuant to the Plan.

D.    *Timing of Distributions*

Unless otherwise provided herein, any distribution to be made by the Reorganized Debtor shall be made at the time provided in Article II or Article III of this Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making

of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### E.     Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents. The holder must notify the Reorganized Debtor in writing of a change of address or, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different than the address of such holder as set forth in the Schedules. The Reorganized Debtor shall not be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided herein.

### F.     Undeliverable and Unclaimed Distributions

If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies the Reorganized Debtor, as appropriate, in writing of such holder's then-current address, at which time all missed distributions shall, subject to the final sentence of this paragraph, be made as soon as is practicable to such holder, without interest.  Checks issued by the Reorganized Debtor in respect of Allowed Claims shall be null and void if not negotiated within one hundred and sixty (160) days after the date of issuance thereof. After such date, all such distributions shall be deemed unclaimed property under § 347(b) of the Bankruptcy Code and shall become unencumbered Cash and property of the Reorganized Debtor. At the request of the Creditor Representative but prior to the 160 day period, the Creditor Representative may elect to locate, for a period of 60 days, any Claim holder whose distribution that is returned as undeliverable, but all costs for such efforts to locate the Claim holder shall be borne by and deducted from any distribution due or to be made to such Claim holder.  In cases where the Creditor Representative is unable to locate the affected Claim holder as set forth in this paragraph, after such date, all such distributions shall be deemed unclaimed property under § 347(b) of the Bankruptcy Code and shall become unencumbered Cash and property of the Reorganized Debtor.

### G.     Setoffs

To the extent permitted under applicable law, the Reorganized Debtor may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim. Neither the failure to affect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by theDebtor of any such claims, rights and causes of action that the Debtor may possess against such holder.

### H.     Application of Distributions

Distributions to any holder of an Allowed Claim shall be applied first to the satisfaction of the principal portion (as determined for federal income tax purposes) of any such Claim and thereafter to the remaining portion of such Allowed Claim, if any.

*I.*        *Withholding and Reporting Requirements*

        In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtor, as applicable, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution, including withholding tax obligations in respect of in-kind (non-Cash) distributions. Any party issuing any instrument or making an in-kind (non-Cash) distribution under the Plan has the right, but not the obligation, to refrain from making a distribution until the holder of the Allowed Claim, for which such distribution is to be made, has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED AND DISPUTED CLAIMS

*A.*        *No Distributions Pending Allowance*

        Notwithstanding any other provision herein, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on any portion of that Claim unless and until and only to the extent such Claim becomes allowed.

*B.*    *Resolution of Disputed Claims*

        1.        The Reorganized Debtor or the Claims Representative as applicable, shall have the right to make, file and prosecute objections to Claims.  A copy of each objection shall be served upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtor), but in no event shall the service of such an objection be later than one (1) month after the Effective Date except as set forth in the Plan, unless such date is extended by order of the Bankruptcy Court. All objections shall be litigated to a Final Order except to the extent such objection is withdrawn, or such objection is compromised, settled or otherwise resolved.

        2.        Reorganized Debtor will reserve sufficient Cash for Disputed Claims.

        3.        The Debtor may, at any time, request the Bankruptcy Court to estimate any Claim pursuant to § 502(c) of the Bankruptcy Code, regardless of whether that Debtor previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim, at any time, including during litigation concerning any objection to such Claim.  In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on the Allowed amount of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim, a Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

33

4.      If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Reorganized Debtor, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided herein, distribute to the holder of such Allowed Claim an amount that provides such holder with the same percentage recovery, as of such date, as other holders of Claims in the relevant Class that were Allowed on the Effective Date.

5.      To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed but rather such distribution amount shall be paid to the other Creditors on a Pro Rata basis in accordance with the terms of the Plan.

## VIII.
## CONDITIONS PRECEDENT TO
## EFFECTIVE DATE OF THE PLAN

*A.      Conditions Precedent to Effective Date*

The Effective Date of the Plan will occur on the Business Day as determined by the Debtor after it reasonably determines that the following conditions have been met or waived:

1.      The Bankruptcy Court has entered the Confirmation Order and it is a Final Order, and such order is in form and substance acceptable to the Debtor and the Committee.

2.      All actions, documents, certificates and agreements necessary to implement this Plan have been affected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

3.      All documents and agreements necessary to implement the Plan, have (a) been tendered for delivery and/or (b) been effectuated or executed, as applicable.

4.      All governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in this Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

5.      All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

6.      Consummation of a sale or refinance of the Debtor's assets in an amount, together with  other Cash on hand, necessary to satisfy the Allowed Secured Claims of Peoples.

7.      The Effective Date of the Plan must occur on before August 31, 2019.

B.      *Waiver or Extension of Conditions*

The conditions to Consummation of the Plan set forth in this Article, other than the condition that the Bankruptcy Court has entered a Confirmation Order in form and substance acceptable to the Debtor, the Committee and People's may be waived, in whole or in part, by the Debtor, in each case after notice to the Committee and People's without further notice, leave, hearing or order of the Bankruptcy Court or any formal action and, thereupon, Consummation may occur.  The Debtor can extend the deadline for consummation of the Plan with the consent of the Committee or Creditor Representative and Peoples.

C.      *Effect of Non-Occurrence of Conditions to Consummation*

If prior to Consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or unexpired leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, or Causes of Action; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE IX.
## SETTLEMENT, RELEASES,
## INJUNCTION AND RELATED PROVISIONS

A.      *Discharge, Compromise and Settlement*

Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to the Debtor or the Reorganized Debtor or any of its respective assets, property and Estate, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, or Equity Interests or other rights of a holder of an Equity Interest or other ownership interest, and upon the Effective Date, the Debtor and the Reorganized Debtor shall (i) be deemed to have received a discharge under § 1141(d)(1)(A) of the Bankruptcy Code and release from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Equity Interests or other rights of a holder of an Equity Security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code,

35

whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under § 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under § 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan, other than to enforce any rights to distributions with respect to such property under the Plan and (ii) terminate and cancel all rights of any Equity Security holder in the Debtor and all Equity Interests.

Except as expressly provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtor, all of the Debtor's assets, property and Estate and the Reorganized Debtor and all of its assets and property any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and all Equity Interests or other rights of a holder of an Equity Interest, relating to the Debtor or Reorganized Debtor or any of its respective assets, property and Estate based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. other than to enforce any rights to distributions with respect to such property under the Plan  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Equity Interests or other rights of a holder of an Equity Interest and termination of all rights of any such holder in any of the Debtor, pursuant to §§ 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtor, the Reorganized Debtor or any of its respective assets, property and Estate at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any holder of any Equity Interest in the Debtor or terminated Equity Interest.

B.      *Protection against Discriminatory Treatment*

In accordance with § 525 of the Bankruptcy Code, of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Case (or during the Case but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Case.

### ARTICLE X.
### MODIFICATION, REVOCATION,
### OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to the limitations contained herein, the Debtor reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in Bankruptcy Code § 1127 and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor expressly reserve its rights to alter, amend, or modify materially the Plan with respect to the Debtor, one or more times, after Confirmation, and, to the extent necessary, may

initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan made prior to Confirmation are approved pursuant to § 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtor revokes or withdraws the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Equity Interests; (ii) prejudice in any manner the rights of the Debtor or any other Entity, including the holders of Claims or Equity Interests; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to Bankruptcy Code §§ 105(c) and 1142 and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Case and all Entities with respect to all matters related to the Case, the Debtor and this Plan as legally permissible, including, without limitation, jurisdiction to:

A.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

B.      resolve any issues related to any matters adjudicated in the Chapter 11 Case;

C.      hear, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date, provided that the Reorganized Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

D.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan or the Disclosure Statement;

E.      resolve any case, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

F.      issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan, except as otherwise provided in this Plan;

G.      enforce the terms and condition of this Plan and the Confirmation Order;

H.      resolve any case, controversies, suits or disputes with respect to the release, exculpation, indemnification and other provisions contained in ARTICLE VIII hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

I.      hear  and determine the Avoidance Actions that may be asserted by the Creditor Representative against the Debtor's Insiders, Armata and Insiders of Armata;

J.      enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

K.      resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

L.      enter an order concluding or closing the Chapter 11 Case.

All of the foregoing applies following the Effective Date; provided, that from the Confirmation Date through the Effective Date, in addition to the foregoing, the Bankruptcy Court shall retain jurisdiction with respect to all other matters of this Plan that were subject to its jurisdiction prior to the Confirmation Date; provided, further, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement.  Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the Bankruptcy Court.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

A.      *Dissolution of the Committee*

On the later of the (1) Effective Date or (2) the date all objections to Claims have been adjudicated by Final Order, the Committee shall dissolve, provided, however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard with respect

to (i) Claims and/or applications for compensation by Professionals and (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Creditors' Committee is a party.  Upon dissolution of the Committee, all current and former members of the Committee and their respective officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Case, and the retention or employment of the Committee's attorneys, accountants, and other agents shall terminate, except as otherwise provided in this Plan.

B.    *Insurance*

The Debtor will continue to maintain appropriate insurance coverage consistent with its prior practices.

C.    *Intentionally Deleted*

D.    *Entire Agreement*

Except as otherwise described herein, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

E.    *Closing of Chapter 11 Case*

The Reorganized Debtor will within one hundred twenty (120) days after the Effective Date, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.  The Reorganized Debtor will provide written notice to the Creditor Representative of its intention to close the Chapter 11 Case contemporaneous with filing any such motion.

F.    *Successors and Assigns*

This Plan shall be binding upon and inure to the benefit of the Debtor and its respective successors and assigns, including, without limitation, the Reorganized Debtor.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

G.    *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is consummated.  Neither the filing of this Plan and the Disclosure Statement, any statement or provision contained herein, nor the taking of any action by the Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the holders of Claims or Equity Interests or other Entity; or (2) any holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an Executory Contract or unexpired lease or that the Debtor or the Reorganized Debtor has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, Avoidance Actions, or other rights of the Debtor or the Reorganized Debtor under any executory or non-executory contract or unexpired or expired lease.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor, as applicable, under any executory or non-executory contract or unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtor or Reorganized Debtor, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

H.    *Severability*

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

I.    *Service of Documents*

All notices, requests, and demands to or upon the Debtor or the Reorganized Debtor to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Windsor Marketing Group, Inc.
> Attention: Kevin Armata, CEO
> 100 Marketing Way
> Suffield, CT 06078
>
> **With copies to:**
>
> Zeisler & Zeisler, P.C.

> Attn: Matthew K. Beatman, Esq.
> 10 Middle St.
> 15th Floor
> Bridgeport, CT 06604

J.      *Plan Exhibits and Schedules*

All exhibits and schedules to this Plan are incorporated and are a part of this Plan as if set forth in full therein.

L.      *Effect of Non-Occurrence of Conditions to Consummation*

If prior to Consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or unexpired leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, or Causes of Action; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

**[THE BALANCE OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]**

Dated this 25 day of _____June_____, 2019.

Respectfully submitted,

WINDSOR MARKETING GROUP, INC.

By: _____

Kevin Armata

Its: President

Attorneys for the Debtor:

Matthew K. Beatman, Esq.
ZEISLER & ZEISLER, P.C.
10 Middle Street
Bridgeport, CT 06604
Telephone 203.368.4234