**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| ------------------------------------------------------- | **X** | |
| **In re:** | **:** | **CHAPTER 11** |
| | **:** | |
| **WINDSOR MARKETING GROUP, INC.** | **:** | **CASE NO. 18-20022** |
| ------------------------------------------------------- | **X** | |

**FOURTH AMENDED DISCLOSURE STATEMENT RELATING TO DEBTOR'S PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

ZEISLER & ZEISLER, P.C.
James Berman
Matthew K. Beatman (ct08923)
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Tel: (203) 368-4234
mbeatman@zeislaw.com
Counsel for the Debtor and Debtor in Possession

July 2, 2019

## <u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT
MUST BE ACTUALLY RECEIVED BY THE DEBTOR
ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

THIS FOURTH AMENDED DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE FOURTH AMENDED PLAN OF REORGANIZATION FOR WINDSOR MARKETING GROUP, INC. (THE "PLAN"). NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTOR, ITS BUSINESS OPERATIONS OR THE VALUE OF ITS ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT. THE DEBTOR URGES YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTOR AND THE REORGANIZATION CASE, THE DEBTOR'S BUSINESS, PROPERTY AND RESULTS OF OPERATIONS, HISTORICAL AND PROJECTED FINANCIAL RESULTS AND A SUMMARY AND ANALYSIS OF THE PLAN.

THE DEBTOR URGES YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTOR AND THE REORGANIZATION CASE, THE DEBTOR'S BUSINESS, PROPERTY AND RESULTS OF OPERATIONS, HISTORICAL AND PROJECTED FINANCIAL RESULTS AND A SUMMARY AND ANALYSIS OF THE PLAN.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  THE PLAN AND THIS DISCLOSURE STATEMENT WERE NOT REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW.  DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017.

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THIS CASE WITH "ADEQUATE INFORMATION" (AS DEFINED IN SECTION 1125 OF THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.  THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT INTENDED

TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND ANY EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN.  IF THERE IS A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS THE DATE SET BY THE COURT IN THE ORDER APPROVING THIS DISCLOSURE STATEMENT, UNLESS EXTENDED BY THE COURT (THE "VOTING DEADLINE").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE DEBTOR'S COUNSEL ON OR BEFORE THE VOTING DEADLINE.

THE EFFECTIVENESS OF THE PLAN IS SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN, THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR EQUITY INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTOR AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.

IT IS THE DEBTOR'S POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE

TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

FORWARD-LOOKING STATEMENTS: THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTOR AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTOR AND THE REORGANIZED DEBTOR'S BUSINESSES. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS.  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THE DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTOR, THE REORGANIZED DEBTOR, ITS ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, NEITHER THE DEBTOR NOR THE REORGANIZED DEBTOR UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

## EXHIBITS

EXHIBIT A Debtor's Fourth Amended Plan Under Chapter 11 of the Bankruptcy Code

EXHIBIT B Financial Projections

-3-

EXHIBIT C Liquidation Analysis

EXHIBIT D List of Claims Debtor recently removed from its Schedule E/F via amendment

EXHIBIT E Estimated Sources and uses of Refinancing Proceeding

EXHIBIT F Proposed loan documents from proposed A/R Lender

# I.
## INTRODUCTION

Windsor Marketing Group, Inc. (the "Debtor"), submits this Fourth Amended Disclosure Statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes for acceptance of the *Debtor's Fourth Amended Plan Under Chapter 11 of the Bankruptcy Code* (as may be amended or modified, the "Plan"). [1]  A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.  The Plan constitutes a separate Chapter 11 plan for the Debtor.

**THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREIN ARE SUPPORTED BY THE DEBTOR AND SOME OF ITS SUBSTANTIAL CREDITOR CONSTITUENCIES.  THE DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED IN THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTOR'S ESTATE, AND PROVIDE THE BEST RECOVERY TO ALL STAKEHOLDERS UNDER THE CIRCUMSTANCES.  AT THIS TIME, THE DEBTOR BELIEVES THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASE.  THE DEBTOR STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.  THE COMMITTEE BELIEVES THE PLAN REPRESENTS THE BEST OPTION FOR OBTAINING A DISTRIBUTION FOR GENERAL UNSECURED CREDITORS IN THIS CASE AND RECOMMENDS THAT GENERAL UNSECURED CREDITORS VOTE TO ACCEPT THE PLAN.**

# II.
## PRELIMINARY STATEMENT

### A.    Plan Overview

On January 8, 2018 (the "Petition Date"), Windsor Marketing Group, Inc. (the "Debtor" or "WMG"), filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Connecticut, Hartford Division (the "Bankruptcy Court").  Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtor has continued to operate its businesses and manage its property, affairs, and assets as debtor-in-possession since the Petition Date.  No trustee or examiner has been appointed in the Debtor's Case.

---

[1]  The definitions set forth in Article I of the Plan will also apply to capitalized terms used herein that are not otherwise defined.

-4-

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtor. The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement contains information concerning, among other matters: (1) the Debtor's background; (2) the assets available for distribution under the Plan; and (3) a summary of the Plan. The Debtor strongly urges you to review carefully the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a creditor.

Upon the entry of an order approving this Disclosure Statement, the Bankruptcy Court will have determined that that this Disclosure Statement contains sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. A copy of the order approving the Disclosure Statement is included with the Disclosure Statement in the package you have received. Under section 1125 of the Bankruptcy Code, this approval enabled the Debtor to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not considered for approval the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

## I.      INTRODUCTION

### A.      Introduction.

The Debtor has proposed and filed with the Bankruptcy Court a Chapter 11 plan of reorganization. The Debtor's plan is annexed hereto as Exhibit A (the "Plan"). The Debtor is seeking confirmation of the Plan by the Bankruptcy Court.

This Disclosure Statement is provided pursuant to Bankruptcy Code section 1125 to all known Creditors of the Debtor. The purpose of this Disclosure Statement is to provide the holders of Claims in this Case with sufficient and adequate information with respect to the Plan to enable such holders to make an informed decision in exercising its right to vote to accept or reject the Plan. This Disclosure Statement discusses, among other things, voting instructions, the history of the Debtor's business, classification and treatment of Claims against the Debtor, certain other key provisions of the Plan, certain federal tax consequences of the Plan, and alternatives to confirmation and consummation of the Plan.

The Plan is the product of extensive work and analysis by the Debtor and of negotiations with the Committee and the Debtor's senior secured creditor, Peoples United Bank, Peoples Leasing Corp., Connecticut Department of Economic and Community Development and Fujifilm North America Corporation. The Plan is a reorganizing plan that contemplates the financial rehabilitation of the Debtor and the continuation of its business. The primary purposes of the Plan are to ensure that the Debtor's stable cash flow can service its senior long-term debt and to compromise the Debtor's obligations to, among others, holders of Allowed Unsecured Claims and Allowed Secured Claims. The restructuring proposed in the Plan will enable the Debtor to exit Chapter 11, service its debts, and continue its existing operations. The Debtor will retain its assets and operate its business

after confirmation of the Plan.  As described herein, the Debtor believes that any alternatives to the Plan would produce less for Creditors than they would receive under the Plan and would endanger or terminate the operation of the Debtor's business.

**B.      This Disclosure Statement.**  This Disclosure Statement has been approved by an order of the Bankruptcy Court as containing "adequate information," as that term is defined in Bankruptcy Code section 1125, to enable the Debtor's Creditors to make an informed judgment about whether to accept or reject the Plan.  However, the Bankruptcy Court has not passed upon the merits of the Plan or conducted a detailed inquiry into the contents of this Disclosure Statement, and neither this Disclosure Statement nor the order approving it should be construed as an approval or endorsement of the Plan by the Bankruptcy Court.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself.  If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.  The Plan is a legally binding arrangement and should be read in its entirety.  All members of voting Classes are urged to study the Plan carefully in conjunction with this Disclosure Statement in order to make an informed judgment about the Plan.  Creditors also should consider consulting with its own legal counsel regarding the Plan.  **Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.**

This Disclosure Statement has been prepared in accordance with Bankruptcy Code section 1125 and not in accordance with federal or state securities laws or other non-bankruptcy law.  Unless expressly noted, any financial information contained in this Disclosure Statement has not been independently audited.  The Debtor has prepared the information contained in this Disclosure Statement in good faith, and every effort has been made to ensure that the information contained in this Disclosure Statement is accurate.  The statements made in this Disclosure Statement generally are made as of the date hereof, unless another time is specified, and delivery of this Disclosure Statement after that date does not mean that the information set forth in this Disclosure Statement remains unchanged since the date of this Disclosure Statement.  Moreover, certain of the statements contained in this Disclosure Statement are, by its nature, forward-looking and contain estimates, assumptions and projections, and there can be no assurance that these forward looking-looking statements will turn out to be true.  This Disclosure Statement and the information contained herein should be used solely to assist in deciding whether or not to vote in favor of the Plan.

Attached to this Disclosure Statement are the Plan (Exhibit A), the Debtor's projected financial information post confirmation (Exhibit B), and a liquidation analysis for the Debtor (Exhibit C).  These Exhibits should be attached to the Disclosure Statement that was served on you.  If any of the Exhibits  identified above were not attached to the Disclosure Statement served on you and you want to obtain copies of such Exhibits, you may do so by sending a written request to the Debtor at the following address so as to be received prior to the Confirmation Date: Zeisler & Zeisler, P.C., 10 Middle Street, 15th Floor, Bridgeport, CT  06604, Attn Matthew K. Beatman, Esq.

**C.      Voting and Confirmation Hearing.** In order for the Plan to be confirmed, Bankruptcy Code section 1129(a) requires that each impaired Class of Allowed Claims in the Plan vote to accept that Plan, subject to certain exceptions.  The Bankruptcy Code defines acceptance of a plan of reorganization by a class of creditors as acceptance by holders of two-thirds in dollar amount

-6-

and a majority in number of the claims in that class, but for this purpose considers only those creditors that actually cast ballots for acceptance or rejection of a plan. Creditors that fail to vote are not counted as either accepting or rejecting a plan. Only Classes of Claims that are "impaired" are entitled to vote to accept or reject the Plan. As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable or contractual rights attaching to the claims of that class are modified by a plan.

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into account the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in Bankruptcy Code section 1129(b).

The Plan provides that if all of the applicable requirements of Bankruptcy Code section 1129(a), other than section 1129(a)(8) thereof (i.e., acceptance of the Plan by all impaired Classes), are met with respect to the Plan, then the Debtor requests that the Bankruptcy Court, pursuant to Bankruptcy section 1129(b), confirm the Plan notwithstanding the requirements of Bankruptcy Code section 1129(a)(8). In the event that any one or more of Classes 1, 2, 3, 4, 5 or 6 fails to accept the Plan as required by Bankruptcy Code section 1129(a), the Debtor believes that the Plan may be confirmed in accordance with Bankruptcy Code section 1129(b) without amendment or modification. **THE DEBTOR WILL SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS IN THE EVENT THAT ANY IMPAIRED CLASS OR CLASSES OF CLAIMS REJECTS THE PLAN.**

After carefully reviewing this disclosure statement, each holder of an Allowed Claim entitled to vote to accept or reject the Plan should vote on the enclosed ballot and return such ballot so that it is received by the voting deadline set forth in the order approving this Disclosure Statement. Any ballot that does not indicate either an acceptance or a rejection of the Plan will not be counted toward determining acceptance or rejection of the Plan. A vote to accept or reject the Plan can only be made by proper submission of a duly completed and executed ballot. Any person who holds Claims in more than one Class is required to vote separately with respect to each Class in which such person holds Claims.

**TO BE COUNTED, YOUR PROPERLY FILLED OUT AND EXECUTED BALLOT MUST BE RECEIVED BY COUNSEL FOR THE DEBTOR BY THE DEADLINE SET FORTH IN THE ORDER APPROVING THIS DISCLOSURE STATEMENT, UNLESS THIS SOLICITATION DEADLINE IS EXTENDED BY ORDER OF THE BANKRUPTCY COURT. BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED. IT IS OF THE UTMOST IMPORTANCE THAT YOU VOTE PROMPTLY TO ACCEPT OR REJECT THE PLAN AFTER CAREFULLY REVIEWING THE PLAN AND THIS DISCLOSURE STATEMENT.**

**Ballots are to be sent to counsel for the Debtor at the following address: Zeisler & Zeisler, P.C., 10 Middle Street, 15th Floor, Bridgeport, CT 06604, Attn: Matthew K. Beatman, Esq.** If you wish to change or withdraw your vote after submission of a ballot, Bankruptcy Rule 3018(a) requires that you provide notice and show cause at a hearing before the Bankruptcy Court.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan on a date and time set forth in the order approving this Disclosure Statement at the United States Bankruptcy Court, 450 Main Street, Hartford, CT.  The Bankruptcy Court has directed that objections, if any, to the confirmation of the Plan be served and filed on or before the deadline set forth in the order approving this Disclosure Statement.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of an adjournment date made at the confirmation hearing or at any subsequently adjourned confirmation hearing or on the Bankruptcy Court docket.

Bankruptcy Code section 1128(b) provides that any party in interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served upon: Zeisler & Zeisler, P.C., 10 Middle Street, 15th Floor, Bridgeport, CT  06604, Attn: Matthew K. Beatman, Esq., Attorneys for the Debtor, on or before the deadline set forth in the order approving this Disclosure Statement.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  Unless an objection is timely served and filed, it will not be considered by the Bankruptcy Court.

At the confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code section 1129 have been met.  The Debtor believes that the Plan meets the applicable requirements of Bankruptcy Code section 1129 (other than those pertaining to voting, which has not yet taken place) and will seek a ruling of the Bankruptcy Court to this effect at the hearing on confirmation of the Plan.

**ALL PROJECTED RECOVERIES ARE MERELY ESTIMATES, BASED ON ASSUMPTIONS WHICH ARE SET FORTH IN THIS DISCLOSURE STATEMENT.  TO THE EXTENT THAT ACTUAL RESULTS VARY FROM THE ASSUMPTIONS, RECOVERIES MAY VARY FROM THE ESTIMATES.**

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS. THE DEBTOR URGES CREDITORS TO VOTE TO ACCEPT THE PLAN.**

**II.      SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

The following table classifies Claims against, and Equity Interests in, the Debtor into separate Classes and summarizes the treatment of each Class under the Plan.  The table also identifies which Classes are entitled to vote on the Plan based on the provisions of the Bankruptcy Code.  Finally, the table indicates the estimated recovery for each Class.  The summaries in this table are qualified in its entirety by the description and the treatment of such Claims and Equity Interests in the Plan.  As described in this Disclosure Statement, the Debtor's businesses are subject to a number of risks. The recoveries and estimates described in the table represent the Debtor's best estimates given the information available on the date of this Disclosure Statement.  All statements relating to the aggregate amount of Claims in each Class are only estimates based on information known to the Debtor as of the date hereof, and the final amounts of Allowed Claims in any particular Class may vary significantly from these estimates.

-8-

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified. Except as specifically noted therein, the Plan does not provide for payment of postpetition interest on any Allowed Claims.

## III.    BACKGROUND

**A.    The Debtor's Business.**  The Company is a C Corporation, owned and operated by its founder, Kevin Armata ("Armata"). The Company leases its facility from Marketing Research Park LLC ("MRP") which is managed by Armata Realty, LLC. Armata is the single member of Armata Realty, LLC and MRP.

WMG had enjoyed profitable operations and growth for more than 40 years through 2016, when revenues peaked at approximately $35 million and adjusted EBITDA (Earnings Before Interest, Taxes Depreciation and Amortization – essentially a measure of net income (or earnings) with interest, taxes, depreciation and amortization added back) was greater than $5 million.  In mid-2016, however, the Company's largest customer, representing 61% or $21 million of revenue annually, completed a reorganization that would consume much of 2017, a period when it would also reconsider branding and establish five new operating units from what had been a single unit. Although future re-branding efforts represent a significant long-term opportunity for its valued marketing partner, WMG, this period of reorganization manifested itself in a substantial decrease in in-store promotions during the transition.  WMG's sales from this customer were approximately $11 and $9 million in 2016 and 2017, a nearly 50% decrease from peak.

Contemporaneously, Armata reorganized and expanded WMG's executive team to help focus on operations and administration, so he could concentrate on sales and marketing.  The reduction in business and change in system controls fostered a liquidity crisis and two unrelated collection issues.

A substantial promotion with WMG's largest client and the related attempt to be paid for that promotion became disputed.  Pushing this issue would have adversely impacted WMG's relationship with its largest customer and WMG elected to take a significant write-down to preserve the relationship.  The resolution has strengthened the relationship and WMG remains a primary consultant and in-store marketer for this customer.

In addition, Toys R' Us filed chapter 11 in September 2017.  Toys R' Us was a significant customer of WMG representing annual revenues of approximately $2.8 million.  WMG lost approximately $750,000 as a result and additional amounts after the filing.  While the loss of this customer added to the recent short-term liquidity issues, WMG's management and diversification of its customer portfolio base has addressed the loss of the customer so that the impact has been significantly ameliorated.  The Debtor has added 6-8 customers resulting in additional sales exceeding $1.5 million and continues to solicit more in the automotive parts industry, athletic apparel and gear industry and the retail grocery industry that have helped make up for the loss of Toys R' Us as a customer.

Armata also infused $1.5 million into the Company in 2017. In January 2018, Armata stepped back into the COO role and reinstated historic procedures and controls.  Manpower was reduced

from a headcount of 180 to 126 (which flexes as high as approximately 150 in season) full-time employees.  The relationship with its senior lender, People's United Bank, suffered through this period.  The Debtor brought in a Chief Restructuring Officer at the recommendation of People's United Bank ("PUB" or "People's").  Despite these steps, the Company struggled to meet current obligations and filed for protection under chapter 11 on January 8, 2018.

### B.      The Debtor's Case.

On January 8, 2018, the Debtor filed its voluntary petition for the relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  In accordance with sections 1107 and 1108 of the Bankruptcy Code, the Debtor is authorized to continue to operate its business as a debtor-in-possession. No trustee or examiner has been appointed in these proceedings.

To enable the continued operation of its business, avoid short-term liquidity concerns, and preserve the going concern value of its estate, the Debtor obtained approval to use cash collateral as defined by the Bankruptcy Code.

The Debtor has retained professionals to assist with the reorganization process, including attorneys, and financial advisors.

The Bankruptcy Court issued an order (the "Bar Date Order") establishing May 7, 2018 as the date by which proofs of claims (of parties other than governmental units) against the Debtor was to be filed in the Reorganization Case (the "Bar Date"). A notice of the Bar Date was sent to all creditors as part of the Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, and Deadlines dated January 9, 2018.

During the case, the company has had difficulty generating new sales due to cash constraints.  The sales department recognizes that limited resources have to be allocated to long-standing customers first and therefore is cautious in approach to "spot" work.  Projects for new or sporadic customers must be carefully considered to ensure cash will be available to purchase the raw materials necessary for timely delivery.  Absent the capital that is expected to be available from a refinance (and attendant exit from 11), only modest, if any, sales gains can be expected while operating in 11.

Recent gross sales are as follows:

  - Nov-18 - 1,452,385
  - Dec-18 -   906.498
  - Jan-19 -  1,091,499
  - Feb-19 -   894,089
  - Mar-19 -   924,083
  - Apr-19 -  1,038,430
  - May-19 -  1,045,844
  - June -19    740,000 (approximately)

-10-

## IV.    THE DEBTOR'S PLAN OF REORGANIZATION

### A.    Overview of Chapter 11.

Chapter 11 is the principal business reorganization Chapter of the Bankruptcy Code.  Under Chapter 11, a debtor is authorized to restructure its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that comprises of all of the legal and equitable interests of the debtor as of the bankruptcy filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a Chapter 11 plan is the principal objective of a Chapter 11 reorganization case.  A Chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a Chapter 11 plan by the bankruptcy court makes that plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of the debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes them for the obligations specified under the confirmed plan.

In general, a Chapter 11 plan of reorganization: (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan, and (c) contains other provisions necessary to the restructuring of the debtor that are required or permitted by the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a Chapter 11 plan may not be solicited after the commencement of a Chapter 11 case until such time as the court has approved the disclosure statement as containing adequate information. Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the Chapter 11 plan.  To satisfy the applicable disclosure requirements, the Debtor submits this Disclosure Statement to holders of Claims that are impaired and not deemed to have rejected the Plan.

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a Chapter 11 plan. This term is used throughout the Plan and the descriptions below.  In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed.  These include, but are not limited to, claims that are unenforceable

-11-

under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed its reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement. Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a Chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon its legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than its holders, are classified.

Under a Chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the Chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under Chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of its reasonable reliance upon any acceleration rights, and does not otherwise alter its legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in Cash, with post-petition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with its terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced. Pursuant to 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, its votes are not solicited. Under the Debtor's Plan, there is no class of claims which are unimpaired, and, therefore, there are no holders of claims who are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization. For a more detailed description of the requirements for confirmation, see section below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION -- Requirements for Confirmation of the Plan of Reorganization."

B.    **Overview of the Plan.**

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND ANY EXHIBITS AND SCHEDULES THERETO.**

The Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. Claims and Interests shall be included in a particular Class only to the extent such Claims or Interests qualify for inclusion within such Class. The Plan separates the various Claims and Interests (other than those that do not need to be classified) into seven (7) separate Classes. These Classes take into account the differing nature and priority of Claims against, and Interests in, the Debtor. Unless otherwise indicated, the characteristics and amounts of the Claims or Interests in the following Classes are based on the books and records of the Debtor.

This section summarizes the treatment of each of the Classes of Claims and Interests under the Plan and describes other provisions of the Plan. Only holders of Allowed Claims — Claims that are not in dispute, contingent, or unliquidated in amount and are not subject to an objection or an estimation request — are entitled to receive distributions under the Plan. For a more detailed description of the definition of "Allowed," see Article I of the Plan. Until a Disputed Claim becomes Allowed, no distributions will be made.

The Plan is intended to enable the Debtor to continue present operations without the likelihood of a subsequent liquidation or the need for further financial reorganization. The Debtor believes that it will be able to perform its obligations under the Plan. The Debtor also believes that the Plan permits fair and equitable recoveries.

The Confirmation Date will be the date that the Confirmation Order is entered by the Clerk of the Bankruptcy Court. The Effective Date will be the first Business Day on or after the Confirmation Date on which all of the conditions to the Effective Date specified in Article VIII of the Plan have been satisfied or waived, including the consummation of the transactions contemplated by the Plan.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Interests. The Debtor will make all payments and other distributions to be made under the Plan unless otherwise specified.

The Plan constitutes a plan of reorganization for the Debtor. All Claims and Interests, except Administrative Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article III of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distribution under the Plan and under sections 1122 and 1123(a)(1) of the

-13-

Bankruptcy Code. However, a Claim or Interest is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

**THE TREATMENT OF MANY ADMINISTRATIVE CLAIMS, SECURED CLAIMS AND THE UNSECURED CLAIMS AS SET FORTH IN THE PLAN ARE RESOLUTIONS OF DISPUTED CLAIMS FOR WHICH THERE ARE NUMEROUS ISSUES AS TO LIABILITY AND DAMAGES.  THE DEBTOR BELIEVES THE RESOLUTIONS AS SET FORTH HEREIN MAY BE APPROVED BY THE COURT UNDER FED. R. BANKR. P. 9019 THIS INCLUDES THE PROPOSED RESOLUTION OF CLAIMS WITH PEOPLE'S, THE DECD, FUJIFILM, AGFA, MRP, ARMATA, THE COMMITTEE AND CNE.**

     **1.**       **Unclassified Claims.**

*a.*    *Administrative Claims*

Except with respect to Administrative Claims that are for Professional Fees and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Case or a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; provided that Allowed Administrative Claims that arise in the ordinary course of the Debtor' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

Except as otherwise provided in this Article IV.B.1.a. and except with respect to Administrative Claims that are for Professional Fees, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtor no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property and such Administrative Claims shall be deemed discharged as of the Effective Date.  On or before the Effective Date, the Debtor shall file and serve a Notice of Effective Date and Administrative Claims Bar Date on all creditors which notice shall set forth the Administrative Claims Bar Date and the procedure for filing a request for payment of an Administrative Claim, including the address where all such requests for payment of Administrative Claims must be sent.

*b.*    *Accrued Professional Fees*

     1)    <u>Final Fee Applications for Professional Fees and Payment of Professional Fees</u>

-14-

All final requests for payment of Professional Fees incurred during the period from the Petition Date through the Effective Date other than for the Debtor's counsel shall be Filed no later than ninety (90) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Court orders, the Allowed amounts of such Professional Fees shall be determined by the Court. The amount of Professional Fees owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtor. The Debtor estimates that professional fees, including fees for the Debtor's investment advisor, may total approximately $900,000 to $1,000,000, but the actual number may vary and depend on litigation and the confirmation process. The Debtor intends to use the proceeds from any recovery of the claim against Toy R Us, cash on hand and any refund or proceeds from any refund from a tax refund from the State of Massachusetts to pay allowed Professional Fees over a four-year period in no less that equal monthly installments commencing within sixty days of the Effective Date.

2)      Estimation of Fees and Expenses

The Committee's Professionals shall estimate their Professional Fees before and as of the Confirmation Date and shall deliver such estimate to the Debtor no later than ten (10) days prior to the Effective Date (it being understood that it shall not be a condition precedent to the occurrence of the Effective Date that such estimates have been provided); provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional, and such Professionals are not bound to any extent by the estimates. If any of the Debtor's or the Committee's Professionals fail to provide an estimate or does not provide a timely estimate, the Debtor may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall be utilized by the Debtor to determine the Administrative Claims as of the Effective Date.

3)      Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtor. Upon the Confirmation Date, any requirement that Professionals comply with §§ 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

c.      *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement release and discharge of each Allowed Priority Tax Claim, on the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor or Reorganized Debtor: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by such holder and the Debtor or Reorganized Debtor, as applicable; provided, however, that such parties may further agree for the

-15-

payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtor, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in quarterly installment payments over a period not more than five years after the Petition Date, pursuant to § 1129(a)(9)(C) of the Bankruptcy Code.  The Debtor estimates that Priority Tax Claims total approximately $72,000.00.

d.    *Statutory Fees*

All fees due and payable pursuant to § 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtor.  On and after the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable, and shall file with the Court monthly or request and file quarterly reports.  The Debtor will remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

e.    *CONSTELLATION NEWENERGY, INC. ("CNE")*

To the extent  the Court enters an order approving the proposed settlement between the Debtor and CNE, on the Effective Date, CNE will have an allowed administrative expense claim in the reduced amount of $150,000.00 (the "CNE Administrative Expense Claim") less any payments it received after February 1, 2019, the balance of which is to be paid as follows: $25,000.00 within seven (7) days after a Final Order enters approving a stipulation approving a settlement with CNE (or if no stipulation or order approving same has entered, the Effective Date,  and beginning on the 1st or 15th day of the following month that is at least two-weeks from the date that the $25,000.00 payment set forth in this paragraph was made to CNE, the Debtor will pay CNE $10,416.66 twice per month (on the first and 15th) until the CNE Administrative Expense Claim is paid in full without interest in full satisfaction of the CNE Administrative Claim.  For avoidance of doubt, the Debtor is making only one payment of $25,000.00 toward the CNE Administrative Claim either before or after Confirmation. As of the date the Plan has been executed, the Committee has not agreed to the proposed settlement between the Debtor and CNE or the proposed payment schedule on the CNE Administrative Claim. CNE has not agreed to any material changes to the proposed settlement set forth in the Fourth Amended Disclosure Statement and/or Fourth Amended Plan

f.    *FUJIFILM NORTH AMERICA CORPORATION*

Fujifilm North America Corporation ("Fujifilm") shall have an Allowed Administrative Claim on the Effective Date in the amount of any sums which are due and payable as of the date thereof pursuant to that certain Adequate Protection Agreement (the "Fujifilm Adequate Protection Agreement") approved by order of the Bankruptcy Court entered on August 7, 2018 [Docket No. 265], and the Fujifilm Adequate Protection Agreement shall terminate on the Effective Date except as provided in Article III.A.3.iii of this Plan.  For the avoidance of doubt, as of June 20, 2019 six monthly adequate protection payments totaling $54,000.00, plus additional amounts for goods shipped to the Debtor post-petition in the ordinary course of business, were due and payable by the Debtor to Fujifilm pursuant to the Fujifilm Adequate Protection Agreement, which amounts constitute an Allowed Administrative Claim

-16-

## ARTICLE V.
## DESIGNATION AND TREATMENT OF CLASSES OF CLAIMS AND CLASSES OF EQUITY INTERESTS

A.    *Designation of and Specification of Impairment and Treatment of Classes of Claims and Classes of Equity Interests*

All Claims and Equity Interests, other than Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in Article V for all purposes, including voting, Confirmation, and distributions pursuant to this Plan and pursuant to §§ 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

NOTWITHSTANDING ANYTHING IN THE PLAN OR ELSEWHERE TO THE CONTRARY, THE DEBTOR SHALL HAVE THE OPTION TO PREPAY THE SECURED, PRIORITY OR ADMINISTRATIVE CLAIM OF ANY PARTY IN INTEREST WITHOUT PENALTY.

1.    Class 1—Secured Claims of People's United Bank and Peoples Leasing Corp.

a.    *Classification*:  Class 1 consists of People's United Bank's and Peoples Leasing Corp.'s (collectively "People's") Secured Claims against the Debtor.

b.    *Impairment and Voting*:  This Class is impaired under and is entitled to vote on the Plan.

c.    *Treatment*:

i.    Allowance: People's filed Secured Claims No. 2 and 11 in the amount of $2,866,657.88 and $4,457,215.64 respectively.  People's Secured Claims shall be reduced to and Allowed based on a prior contribution from Kevin Armata in the amount of $250,000.00 and prior payments from a tax refund totaling $645,099.00 previously received by People's and a refinance of the Debtor's assets with the net proceeds from the refinance of the Debtor's assets after paying or reserving for certain expenses as set forth in the attached Exhibit E, and so that Peoples receives in a best case scenario the sum of $3,004,901 or in a worst case scenario, the sum of $2,653,400 and the balance of its Secured Claims shall be released. The Debtor will continue making adequate protection payments to People's Leasing Corp in accordance with the existing order entered by the Bankruptcy Court until the earlier of the Effective Date or the date the Allowed Secured Claims of People's has been satisfied as set forth herein, subject to appropriate proration as of the date People's Allowed Secured Claims have been satisfied.  People's shall waive any Unsecured Claim on the Effective Date.

The allowance and treatment of the Secured Claims of Peoples in the Plan shall be in full and final settlement of all claims that have been asserted by the Committee against People's United Bank in Adversary Proceeding 18-2014 (the "People's Complaint") on the Effective Date, and, upon the exchange of mutual releases by and between People's and the Committee and the waiver of People's Unsecured Claim on the Effective Date, People's Complaint and Adversary Proceeding 18-2014 shall be dismissed with prejudice. If

-17-

People's does not waive its Unsecured Claim, nothing in the Plan shall alter or affect the Committee's right and authority to pursue the People's Complaint.

ii.    <u>Liens</u>: People's shall retain its liens on its Collateral (other than in any refunds from the State of Massachusetts and any accounts receivable due from Toys R Us) to secure the Allowed Secured Claim of People's with the same validity, priority and extent as existed on the Petition Date.

iii.    <u>Payment</u>: Unless paid sooner, People's Allowed Secured Claim will be paid within one week of the Effective Date.  The Debtor anticipates paying off the People's Secured Claim from the proceeds of a refinancing of its assets.  It is anticipated that Armata and his related entities will sign a separate personal note or be responsible for a reduced deficiency to be agreed upon as part of any settlement with People's.  Armata and his related entities have reached a resolution in principal with People's which needs to be finalized prior to Confirmation.  People's is reviewing but has not yet decided if it will accept the treatment of Class 1.

2.    <u>Class 2—Secured Claim of Connecticut Department of Economic and Community Development</u>

a.    *Classification*:  Class 2 consists of the Secured Claim of Connecticut Department of Economic and Community Development ("DECD")

b.    *Impairment and Voting*:  This Class is impaired under the Plan.

c.    *Treatment*:

i.  Allowance:  The Secured Claim of the DECD shall be reduced from $1,051,326.64 and Allowed in the amount of $269,651.02, and the balance of the Secured Claim shall be waived, disallowed and expunged as against the Debtor and Armata as of the Confirmation Date, provided, however, that such waiver, release and discharge is conditioned upon WMG not relocating its business outside the State of Connecticut at any time prior to the date the Allowed Secured Claim of DECD is paid in full, as provided by §2.10 (G) of the Assistance Agreement No. 1 between DECD and WMG, fully executed as of March 20, 2009 ("Assistance Agreement No. 1").  In the event this relocation condition does not remain satisfied until the Allowed Secured Claim of DECD in the amount of $269,651.02 is paid in full, the forgiveness credit in the amount of $1,000,000 will automatically be added to the Allowed Secured Claim of DECD, together with a one-time penalty charge of 7.5%, all of which shall be immediately due and payable upon relocation. Any other default including a payment default shall not reinstate the forgiveness credit of $1,000,000.00.

ii.    Liens: The DECD shall retain its liens on its Collateral (other than in any refunds from the State of Massachusetts and any accounts receivable from Toys R US) to secure the Allowed Secured Claim of the DECD with the same validity, priority and extent as existed on the Petition Date, subordinated to the lien of any new lender that extends credit to the Debtor that helps satisfy the Allowed Secured Claim of Peoples.

iii.    Payment: The Allowed Secured Claim of the DECD will be amortized and paid such that DECD receives $5,000.00 per month for until January 2020, with the balance of the Allowed Secured Claim to be amortized and paid thereafter, with interest, as provided in the Assistance Agreement No.1 between the parties.  Section 2.10(G) of the Assistance Agreement No. 1 between the parties will remain enforceable, such that if the Debtor relocates its entire operation out of state, the forgiveness credit in the amount of $1 million will be automatically added to Allowed Secured Claim of the DECD, together with a one-time penalty charge of 7.5% as set forth in the Assistance Agreement No. 1 , all of which would be immediately due and payable upon relocation. DECD will also receive written guaranties of payment of its

-18-

secured and unsecured claims from Armata and entities owned or controlled by Armata that previously guaranteed the DECD Allowed Secured Claims and Unsecured Claims. The Debtor has no present intention of relocation, and even assuming arguendo it would consider it in the future, it will not relocate until all payment obligations under the Plan have been satisfied in full.  The Debtor believes this treatment is acceptable to the DECD.

      3.    <u>Class 3—Allowed Secured Claim of Fujifilm North America Corporation</u> ("Fujifilm")

      a.    *Classification*:  Class 3 consists of the Allowed Secured Claims of Fujifilm.

      b.    *Impairment and Voting*:  This Class is impaired under the Plan.

      c.    i. *Allowance:*  Fujifilm filed the following claims:

Claim 31- $611,948.31 (Unsecured)

Claim 32-$548,.568.15 (Secured)

Claim 33-$559,480.12 (Secured)

Fujifilm's two Secured Claims (No. 32-1 and 33-1) shall be reduced to the total amount of $500,000.00 based on an agreement with Fujifilm to avoid the costs and risks of litigation. Consequently, Claim No. 32-1 shall be allowed as a Secured Claim in the amount of $325,000.00 and as an Unsecured Claim in the amount of $223,568.15 and Claim 33-1 shall be allowed as a Secured Claim in the amount of $175,000.00 and an Unsecured Claim in the amount of $384,480.12. The Unsecured Claim of Fujifilm 31-1 in the amount of $611,948.31 shall also be an Allowed Unsecured Claim. The Allowed Secured Claims and Allowed Unsecured Claims of Fujifilm shall not be subject to further objection, setoff or dispute.

      ii.    *Liens:* Fujifilm shall retain its liens on its Collateral (other than in any refunds from the State of Massachusetts and any accounts receivable from Toys R Us) to secure the Allowed Secured Claims of Fujifilm with the same validity, priority and extent as existed on the Petition Date.  Notwithstanding anything in this Plan to the contrary, Fujifilm shall retain its first-priority liens on two Inca Onset printers and software, accessories, and equipment related thereto (the "Fujifilm Printer Collateral").  Fujifilm's interest in Collateral other than the Fujifilm Printer Collateral shall be subordinated to the lien of any new lender that extends credit to the Debtor that helps satisfy the Allowed Secured Claim of Peoples.

      iii.    *Treatment:* The Allowed Secured Claims of Fujifilm will be amortized over thirty-six (36) months with no interest.  The Reorganized Debtor will pay to Fujifilm the sum of Thirteen Thousand Eight Hundred Eighty-Eight and 89/100 Dollars ($13,888.89) per month for thirty-six (36) months commencing sixty (60) days after the Effective Date in full satisfaction of its Secured Claims.  The Debtor or Reorganized Debtor shall continue to make adequate protection payments of $9,000 per month pursuant to the Fujifilm Adequate Protection Agreement until the first month in which Fujifilm is entitled to receive the first Plan payment provided for in this paragraph, which adequate protection payment shall be prorated for the month in which the Plan payments commence.  Except with respect to the $9,000 monthly adequate protection payments provided for in the preceding sentence, on the Effective Date the Fujifilm Adequate Protection Agreement shall terminate and the respective obligations of the Debtor and Fujifilm thereunder shall cease. In the event of a default by the Reorganized Debtor on the Plan payments of Fujifilm's Allowed Secured Claims, which default remains uncured for fifteen (15) days following receipt of written notice of default from Fujifilm, the Reorganized Debtor shall make the Fujifilm Printer Collateral available to Fujifilm upon request pursuant to Section 9-609(c) of the Uniform Commercial Code and Fujifilm will be entitled to pursue any outstanding balance of its Allowed Secured Claims as modified by the Plan against the Reorganized Debtor. The Debtor believes this treatment is acceptable to Fujifilm.

-19-

4.      Class 4—Secured Claims of Agfa, Corporation ("Agfa")

a.      *Classification*:  Class 4 consists of the Secured Claims of Agfa.

b.      *Impairment and Voting*:  This Class is impaired under and is entitled to vote on the Plan.

c.      *Treatment*: Agfa will retain its liens on the equipment securing the Secured Claim of Agfa. Agfa has filed two proofs of claim (Proof of Claim No. 58-1 and 58-2), and the Debtor believes Claim No. 58-1 is essentially a duplicate of 58-2 and will object to Claim No. 58-1 if not withdrawn and reserves the right to object to the Secured Claims of Agfa if the treatment under the Plan is not accepted.

The Allowed Secured Claim of Agfa shall be reduced from $491,795.05 and fixed and allowed in the amount of $325,000 ("Agfa's Allowed Claim"), which amount shall be paid by the Debtor or Reorganized Debtor, as the case may be, by and through Agfa setting off against the outstanding balance of Agfa's Allowed Claim any rebates earned by the Debtor/Reorganized Debtor under that certain Agfa Long Term Equipment Rebate Agreement, effective as of August 1, 2015 (the "Rebate Agreement") and that certain Purchase and Supply Agreement, effective August 1, 2015 (the "Purchase and Supply Agreement"),  each as amended pursuant to "Amendment 1 to Purchase and Supply Agreement and Long-Term Equipment Rebate Agreement" (The Rebate Agreement and the Purchase and Supply Agreement are hereinafter referred to collectively, as amended, the "Agfa Agreements").  The Agfa Agreements shall be assumed by the Debtor and vested in the Reorganized Debtor, pursuant to Section 365 of the Bankruptcy Code; provided, however, that except as otherwise set forth in this Plan or the Plan Confirmation Order, the Reorganized Debtor's obligations to Agfa under the Agfa Agreements shall be non-recourse.

5.      Class 5—Allowed Priority Non-Tax Claims

a.      *Classification*:  Class 5 consists of any and all unpaid Allowed Priority Non-Tax Claims against the Debtor.  The Debtor does not presently believe there are any Allowed Priority Non-Tax Claims.

b.      *Impairment and Voting*:  This Class is not impaired under and is conclusively presumed to have accepted the Plan, and the Debtor are not required to solicit acceptances from any holders of Claims in this Class.

c.      *Treatment*: On the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each Entity holding an Allowed Priority Non-Tax Claim against will receive Cash equal to the Allowed amount of such Priority Non-Tax Claim, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtor prior to the Effective Date and except to the extent that such holder agrees to less favorable treatment.

6.      Class 6—Allowed Unsecured Non-Priority Claims Against the Debtor

a.      *Classification*:  Class 6 consists of Allowed Unsecured Claims against the Debtor.

b.      *Impairment and Voting*:  This Class is impaired under and is entitled to vote on the Plan.

c.      *Treatment*: Without waiving its rights to object to other Claims and reserving the right to object to certain Unsecured Claims as noted in treatment of certain related Secured Claims (e.g. Agfa), the Debtor has recently amended its Schedules delete the claims of certain Creditors for the reasons set forth on Exhibit D attached hereto.

-20-

The Debtor presently anticipates that after amending its Schedules and conforming deficiency claims from Secured Claims (and the waiver of any Unsecured Claims by People's on the Effective Date), that Allowed Non-Priority Unsecured Claims will total approximately $9 million.

Holders of Class 6 Claims shall receive, in full, complete and final satisfaction and release of their Allowed Unsecured Claims, the following: Holders of Allowed Unsecured Claims in Class 6 shall receive their Pro Rata share of a quarterly payment in the amount of $53,571.42 paid each quarter (the "Quarterly Payments") by the Reorganized Debtor to the Creditor Representative for a total of twenty-eight (28) quarters (i.e. the 28 quarters equates to a period of seven years) commencing six months after the Effective Date of the Plan (the "Payment Start Date"). The Creditor Representative shall hold each Quarterly Payment for the benefit of Holders of Class 6 Unsecured Claims and shall issue one annual distribution check to holders of Allowed Unsecured Claims in Class 6. The Reorganized Debtor reserves the right to prepay any of these payments to the Creditor Representative for distribution to the creditors in this class under the Plan without penalty. The Reorganized Debtor reserves the right to review and if it deems appropriate, to object, contest or otherwise challenge any claim that has not previously been allowed by Bankruptcy Court Order in the time frame set forth herein and subject to the rights of the Creditor Representative set forth in Article IV.J.A of the Plan. The deadline to file such objection or challenge is July 9, 2019, subject to the rights of the Debtor, the Committee or the Creditor Representative, as applicable, to seek a further extension of the deadline to file objections to claims. The total payout to holders of Allowed Unsecured Claims in Class 6 shall not exceed $1,500,000.00 in the aggregate and there shall be no interest that accrues on any distributions to Class 6 holders. Presently, the Debtor anticipates objecting to the claim of the Town of Suffield.

      7.    <u>Class 7—Equity Interests</u>

      a.    *Classification*:  Class 7 consists of Equity Interests in the Debtor.

      b.    *Impairment and Voting*:  This Class is impaired under and is entitled to vote on the Plan. The holder of interests in this class is making substantial contributions toward confirmation, including but not limited to the waiver of a partial but substantial arrearage claim on the lease of the business property and the recent cash infusion in the amount of $250,000.00 paid to People's. In addition, Mr. Armata has a scheduled Unsecured Claim of $179, 925.76 and owns Armata Realty, LLC which has a scheduled Unsecured Claim of $462,385.90. MRP is the wholly owned entity which leases the business premises and is owed many hundreds of thousands of dollars, and as part of the settlement with the Committee and the Debtor, Armata, MRP, Armata Realty LLC and any other entity owned or controlled by Armata or another Insider shall waive any right to a distribution and there will be no distribution on these claims from the Debtor to MRP as part of Mr. Armata's contribution to the Plan and Debtor other than such amounts as are necessary to cure an arrearage owed to the First National Bank of Suffield nka PeoplesBank ("FNB") up to the Lease Cap Amount. FNB has provided reinstatement information to the Debtor supporting a balance due of approximately $470,000.00 as of May 2019.For the avoidance of doubt, (i) neither Kevin Armata, MRP, Armata Realty, LLC or any other entity owned or controlled by Kevin Armata or any Insider of Kevin Armata will share in or receive any distribution from the Class 6 Unsecured Claims funds, and (ii) no payments (other than lease payments, wages, benefits and reimbursement of expenses)shall be made to Kevin Armata, MRP, Armata Realty, LLC or any other entity owned or controlled by Kevin Armata or any Insider of Kevin Armata in excess of the Lease Cap Amount unless and until all Quarterly Payments to the Creditor Representative on behalf of holders of Class 6 Claims are paid in full.

c.    *Treatment*: The holder of Equity Interests in the Debtor shall retain his Equity Interests, as modified by the terms of the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Nothing under the Plan shall affect the Debtor' rights in respect of any Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Claims.

D.    *Confirmation Pursuant to § 1129(b) of the Bankruptcy Code*

The Debtor shall seek Confirmation of the Plan pursuant to § 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests. The Debtor reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to § 1129(b) of the Bankruptcy Code requires modification.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that does not have a holder of an Allowed Claim or Allowed Equity Interest or a Claim or Equity Interest temporarily Allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to § 1129(a)(8) of the Bankruptcy Code.

F.    *Settlement with the DECD on Unsecured Claim*

The Debtor has provided the DECD with a job audit demonstrating that it is entitled to a forgiveness credit in the amount of $750,000.00 pursuant to the Assistance Agreement between DECD and WMG, fully executed as of March 27, 2015 ("Assistance Agreement No. 2") and the DECD has reviewed that job audit and confirmed that it satisfies the jobs requirements of Assistance Agreement No. 2 entitling the Debtor to the forgiveness credit in the amount of $750,000.00. Accordingly, and notwithstanding Unsecured Proof of Claim No. 39-2 filed by the DECD to the contrary, Unsecured Claim No. 39-2 of the DECD is reduced to and allowed in the amount of $750,000.00 as of the Effective Date, and the remaining balance is waived, released and discharged as to the Debtor and Armata, provided, however, that such waiver, release and discharge is conditioned upon: (1) WMG and MRP remaining in compliance with their payment obligations set forth in Article III.A.6c. of the Plan and this Subpart F; (2), WMG retaining at all times no less than a percentage negotiated with the DECD (that will not exceed sixty-five (65%) based on the number of full-time employment positions it reported to the DECD it had as of March 15, 2019 based on a rolling 12 month average, which requirement shall be applicable until the date on which the DECD receives $750,000.00 based on its distributions in Class 6 under the Plan and from MRP pursuant to Assistance Agreement No. 2, plus applicable interest under Assistance Agreement No. 2, or if there is an uncured default as set forth in this Subpart F, the additional sum of $750,000.00 based on its distributions in Class 6 under the Plan and from MRP pursuant to Assistance Agreement No. 2, and (3) WMG not relocating its business outside the State of Connecticut before the payment obligations on account of DECD's Unsecured Claim, as supplemented with the payments required to be made by MRP to DECD pursuant to Subpart F of Article III.A.6c of the Plan, have been fully satisfied., which requirement shall be applicable only until the date on which the DECD Secured Claim is paid in full   If either condition (1), (2) or (3) above are not at all times satisfied during the time period

-22-

while payments are to be made to DECD, the forgiveness credit shall be retracted and the Unsecured Claim of DECD shall correspondingly be increased, only upon issuance of a written notice of default to WMG and the Creditor Representative which remains uncured after a period of 30 days from the date of receipt of such notice. In the event that the forgiveness credit in the amount of $750,000 shall be retracted based on default and the Allowed Unsecured Claim of DECD shall be decreased correspondingly by the same amount upon the cure of all defaults then existing under Subpart F of Article III.A.6 of the Plan. For the avoidance of doubt, the cure of any payment defaults shall require the payment to DECD of all amounts then due to DECD under the Plan as of the date of such payment. The Allowed Unsecured Claim and the Allowed Secured Claim of the DECD are and will continue to be secured by a mortgage on the Premises leased by the Debtor from MRP.

MRP will pay the DECD an amount equal to the difference between the quarterly plan payments DECD will receive from the Debtor and the amount of the monthly payments that would be required under the Assistance Agreement No. 2 between the parties on a re-amortized debt in the amount of $750,000.00. The personal obligation of Armata and MRP for these payments will be documented by a promissory note from him and/or MRP to the DECD.

The DECD's mortgages on 100 Marketing Research Drive will be modified to correspond to the restated treatment of DECD's Allowed Secured Claim and Allowed Unsecured Claim, with the understanding that the restated principal balance of the second mortgage will be comprised of the full amount of the reduced Secured Claim ($269,651.02) subject to increase as set forth in the section on treatment of the Allowed Secured Claim of DECD and the third mortgage restated and reduced to the full amount of the allowed Unsecured Claim ($750,000), subject to increase in the event of a relocation or the occurrence of other conditions as set forth herein; and that the modified mortgages would retain their current priority position. Armata has agreed to reaffirm his existing personal guarantees of WMG's indebtedness to DECD, as modified, or execute new ones.

The allowance and treatment of the Secured Claims and Unsecured Claims of the DECD in this Plan shall be in full and final settlement of all claims that have been asserted against the DECD by the Committee in Adversary Proceeding 18-2020 (the "DECD Complaint") and upon the Effective Date, the DECD Complaint shall be dismissed with prejudice on the Effective Date

G.    *Settlement with Committee*

The following summarizes a settlement reached with the Committee, the Debtor and Insiders of the Debtor affiliated with Kevin Armata in addition to the treatment of Class 6 Claims in the Plan. This settlement includes a complete release of all preference claims and Avoidance Actions the Debtor has against trade creditors on the Effective Date and a conditional general release of Armata, MRP, and all related Insiders of the Debtor and Armata from all actions including Avoidance Actions that will be become effective approximately 3.5 years after Quarterly Plan payments commence to holders of Allowed Claims in Class 6 as set forth in greater detail below:

1. Upon the Effective Date, all preference claims and Avoidance Actions against all parties other than Kevin Armata and the Debtor's and Armata's insiders and affiliates including the Debtor's landlord, MRP and Armata Realty, LLC (collectively, the "Insiders") shall be released and waived without any further action by the Debtor or the Reorganized Debtor. The preference actions that are not being released against the Insiders, as well as all other avoidance actions under chapter 5 of the Bankruptcy Code against those same Insiders (collectively, the "Insider Claims") may be prosecuted

by the Creditor Representative or Chapter 7 Trustee, as applicable.  For the avoidance of doubt, no Insider Claims will be brought by the Creditor Representative or Chapter 7 Trustee unless the Reorganized Debtor defaults on the payment of any Quarterly Payments to the Creditor Representative on behalf of General Unsecured Creditors under the Plan and any such default remains uncured beyond any applicable cure period subject the terms set forth in Paragraph G.2. of Article III of the Plan.  The Debtor has not taken into consideration new value, contemporaneous exchange or other defenses which it believes would substantially reduce the total amount of potential preference liability, but there are approximately $5,360,000.00 in transactions that occurred in the ninety days prior to the bankruptcy filing, including payroll expenses of approximately $1.9 million. The Debtor has not taken into consideration new value, ordinary course, contemporaneous exchange or other defenses which it believes would substantially reduce the amount, but the Insider transactions comprised within the year prior to bankruptcy filing of, but not limited to, weekly salary to Kevin Armata of $201,040.00, expense reimbursements to Kevin Armata of $225,114.82 and rent paid to or for the benefit of MRP of $934,025.40 and regular weekly salary paid to Donna Krikorian of $145,200.24 that occurred in the one year period prior to the bankruptcy filing.  The Debtor believes that the salary was paid in the ordinary course, and total rent paid was less than the amount obligated to be paid under the lease which is being assumed under a compromise and a significantly reduced amount as set forth herein.

2. The Debtor shall issue a general release of Armata and all related Insider entities and individuals from all causes of actions or claims of any kind, but such releases under the Plan (whether termed as exculpation, indemnification, release of preferences or other avoidance actions, or otherwise (for avoidance of doubt, including release for preference claims for the Insiders) shall not become effective until the  three and one half (3.5) year anniversary of the Payment Start Date except as set forth in this paragraph. Releases for the Insiders, Armata and the Debtor's and Armata's insiders and affiliates including MRP are contingent on the Reorganized Debtor making all Quarterly Payments to the Creditor Representative on behalf of holders of Allowed Class 6 Claims that are due to be paid during this 3.5-year period after the Payment Start Date. If the Reorganized Debtor has not timely made all payments due during this 3.5 year period, the releases for the Insiders will not become effective until the first date upon which the Reorganized Debtor cures any and all existing payment defaults to the Creditor Representative for the benefit of the holders of Allowed Claims in Class 6 and becomes current on all payments then due to Class 6 creditors as of such date.  All applicable statutes of limitation, etc. for these Insiders shall be automatically tolled commencing upon the filing of the amended plan containing the terms of this settlement and all Insider parties/entities subject to the delayed release consent to the tolling of all applicable statutes of limitation and shall execute tolling agreements if requested by the Creditors' Committee or the Creditor Representative as applicable.  The form of release contemplated in the Plan shall be filed on the docket and with the Court no less than ten (10) days prior to the Voting Deadline.

3. The Insiders waive their right to any distributions on account of their claims against the Debtor and/or its estate other than the post-petition arrearage owed to FNB as of the Effective Date, which distributions to MRP on account of the FNB arrearage shall be capped at $358,000.00 (the "Lease Cap Amount").  MRP will remain current with FNB going forward and with respect to any existing arrearage owed to FNB as of the date the Plan is executed, and will not seek any additional contributions from the Debtor or Reorganized Debtor as part of its cure that exceed such $358,000 Lease Cap Amount, provided however, that such Lease Cap Amount  shall not limit or otherwise effect any other regular monthly obligation owed by the Debtor or Reorganized Debtor to or for the

-24-

benefit of MRP in accordance with its lease of real property with the Debtor and Reorganized Debtor as modified herein and subject to the limitations set forth in paragraphs 5 and 6 below.

4. With respect to Armata's salary:

(a)    Armata will receive a minimum annual gross salary of $175,000.00 as his exclusive compensation (not including any normal and customary benefits, e.g., health, etc.) from the Reorganized Debtor.

(b)    Upon the occurrence of the Effective Date, Armata's salary will increase to $250,000.00 (not including any normal and customary benefits. e.g. health, etc.) from the Debtor, subject to certain withholding/clawback provisions, as follows:

i.        For the period between the Effective Date and the completion of payment of all Administrative Claims for Professionals Fees as set forth in the Plan, if the Reorganized Debtor does not make one or more required payments to such Administrative claimants, his annual salary shall be reduced to $175,000.00 until all such missed Plan payments are made. Once all such missed Plan payments are made, Armata can recoup the unpaid portion of the increased salary; and

ii.        In addition to the foregoing provisions with respect to certain Administrative creditors, for the period between the Payment Start Date and the completion of payment of all amounts to be paid to Class 6 creditors under this Plan, if the Reorganized Debtor does not make one or more required payments to Class 6 creditors, Armata's annual salary shall be reduced to $175,000.00 until all such missed Plan payments are made. Once all such missed Plan payments are made, Armata can recoup the unpaid portion of the increased salary.

(c)    Armata's annual salary is capped at $250,000.00 (subject to the reductions and time frames set forth this this paragraph). Upon the effectiveness of the releases set forth in paragraph G.2 of Article III of the Plan, the $250,000.00 annual salary cap is eliminated. However, Armata's annual salary shall be reduced to $175,000.00 if the Reorganized Debtor does not make the remaining Quarterly Plan payments to holders of Allowed Class 6 Claims and holders of Professional Fees until all such payments are made. Once all missed Plan payments are made by the Debtor, Armata can recoup the unpaid portion of the increased salary.

5. Subject to this subparagraph and the next subparagraph, the rent paid to MRP (in addition to any amount necessary to cure the FNB arrearage) is reduced to $100,000.00 per month until all payments to Class 6 Claimants and Professional Fees under the Plan are completed. Notwithstanding the foregoing, the base rent of $100,000.00 rent will be increased by the amount of any real estate tax increases or mortgage interest rate increases to MRP, which are supported by documentation reflecting the increase that is provided to the Creditor Representative prior to implementing any such rent increase.

6. Upon the effectiveness of the releases in paragraph G.2 of this Article, the monthly rent paid to MRP may be increased by 4% per year. However, if Quarterly Plan payments are not made by the Reorganized Debtor to the Creditor Representative for the benefit of holders of Allowed Class 6 Claims and holders of Professional Fees as provided for under the Plan, the 4% escalation shall be suspended until the Reorganized Debtor makes all missed payments and becomes current on Plan payments to such creditors. Once all such missed Plan payments are made, Armata can recoup the

unpaid portion of the increased rent and the additional rent percentage escalation suspension set forth in this subparagraph shall cease.

7.   The Confirmation Order will specifically provide that, notwithstanding whether the Debtor's lease with MRP is assumed, all claims against MRP are preserved and shall not be barred, limited, or otherwise affected by any assumption of the lease.   For the avoidance of doubt, all defenses MRP could assert against any such claims will be similarly preserved and all defenses of any insider or affiliate not receiving or waiving a distribution under the Plan are similarly preserved.

8.   The Committee will have input on the Claims objection process, including the decision to bring, not to bring, and to settle Claim objections. The Confirmation Order will provide that the Committee has standing and may file a motion challenging the Debtor with respect to any Claim objection, proposed settlement, or failure to bring a claim objection and may file its own objection, to the extent necessary. The Committee shall remain in existence, with counsel and right to payment for its counsel from the Reorganized Debtor, until resolution and completion of the Claims reconciliation and objection process.

9.   The Debtor or Reorganized Debtor shall fund an escrow account in the amount of $25,000 which shall be available to the Committee or Creditor Representative, as applicable, to enforce the rights of holders of Class 6 Claims, including retention of professionals, in the event of the Reorganized Debtor's default under the terms of the Plan.  The Reorganized Debtor shall fund the escrow starting nine months from the Effective Date in the amount of $5,000.00 per month for five months ($25,000.00 total). The escrow amount of $25,000.00 shall not constitute a cap on fees and expenses incurred by the Committee or the Creditor Representative.

10.   The Debtor shall promptly provide the Committee or the Creditor's Representative, as applicable, with quarterly financial reports.  Financial reports shall be provided only to the Creditor Representative, subject to mutually acceptable confidentiality agreement.

# ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.   *Debtor's Actions*

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, and the Reorganized Debtor shall be authorized and directed to take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

B.   *Sources of Consideration for Plan Distributions*

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtor to make payments required pursuant to the Plan will be obtained from the Reorganized Debtor's Cash balances, including Cash from operations, from financing or other capital investment to be obtained by the Debtor, and from net proceeds from the sale of any assets of the Reorganized Debtor.  In particular, the Debtor anticipates refinancing or factoring its accounts receivable and equipment and giving the new lender a first priority lien on its assets.

The Debtor has received approval from a disinterested third party commercial lender's loan committee (the "A/R Lender") to lend funds to the Debtor based on the Debtor's current accounts receivable at closing and is in the process of scheduling an inspection with a third party commercial lender (the "M&E Lender") willing to lend money based on the value of the Debtor's machinery and equipment (presently the amount of the asset based loan is anticipated to be approximately $2 million). The M&E Lender previously gave approval for the loan in 2018, but requires a physical inspection and evaluation of the collateral and the Debtor no more than 60 days prior to the closing to reapprove and close the loan, and this process is now underway. The Debtor's proposed M&E Lender and the A/R Lender are working in tandem to help finance the Debtor. The Debtor will file a copy of the proposed loan documents (or copies that are in material form consistent with the anticipated final version) as a Plan supplement no later than five (5) days prior to the Voting Deadline or the date it receives them from the M&E Lender. A copy of the proposed loan documents from the A/R Lender is attached as Exhibit F. These proposed loan documents remain subject to review and revision by the Debtor and A/R Lender.

Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtor. Once the new lenders are in place, the Reorganized Debtor will fund operations primarily from receiving 85% of its new accounts receivables versus from its collections as it had been doing during the chapter 11. This increase in the availability of funds will allow the Reorganized Debtor to purchase materials more quickly and thereby grow its business quickly to help fund the Plan.

C.      *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, the Debtor shall continue to exist after the Effective Date as a separate legal entity, with all the powers of a corporation or limited liability company, as the case may be, pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

D.      *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property of the Debtor's estate shall vest with the Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.      *Amendment of Existing Agreements and Other Corporate Actions by the Debtor*

On and after the Confirmation Date the Debtor shall take any and all other corporate actions necessary to effectuate the terms of the Plan. Each of the officers of the Debtor is authorized and directed to execute, deliver, file or record such contracts, instruments, releases, indentures and other

agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

F.      *Directors and Officers of the Reorganized Debtor*

Kevin Armata is the sole legal officer and director of the Debtor.  There are four other individuals employed by the Debtor that hold the following titles: Vice-President of Manufacturing, Vice-President of Customer Service, Vice-President of Finance and Executive Vice-President. However, these individuals do not have any formal role or participation in corporate governance. Thus, the Debtor does not view these individuals as officers of the Debtor with capacity or authority to govern its affairs.  Of these other officers, only Donna Krikorian is related to Kevin Armata, her husband.  Her salary is approximately $135,000.00 per year.  On the Effective Date, Kevin Armata shall remain as the sole officer and director of the Reorganized Debtor.

G.      *Exemption from Certain Taxes and Fees*

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant to this Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment. Such exemption under § 1146(a) of the Bankruptcy Code specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien, or other security interest; (2) the making or assignment of any lease or sublease; (3) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any transfer occurring under the Plan.

H.      *Preservation of Causes of Action*

In accordance with § 1123(b) of the Bankruptcy Code, but subject in all respects to Article IX of the Plan, and as otherwise may be set forth in the Plan, the Reorganized Debtor or the Creditor Representative, as applicable shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, (other than Insider Avoidance Actions which may only be pursued by the Creditor Representative) whether arising before or after the Petition Date against Insiders of the Debtor, Armata and Insiders of Armata in accordance with and during the time set forth in the Plan and claims against Agfa regarding its claim and lien, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, provided however that all Avoidance Actions against trade creditors shall be irrevocably waived and released on the Effective Date and the Reorganized Debtor shall have no rights to commence or pursue any such claims. The Reorganized Debtor retains the right to pursue any causes of action regarding the enforceability of US Trustee fees, including the constitutionality of the statute increasing the amounts otherwise due.  The Creditor Representative may pursue Causes of Action against Insiders of the Debtor, Armata and Insiders of Armata, as appropriate, in accordance with the best interests of the Reorganized Debtor but only in accordance with the Plan,

-28-

after a default by the Reorganized Debtor regarding payment to Class 6 Claims and holders of Professional Fees beyond any applicable cure period and provided that the Reorganized Debtor has not subsequently cured any such default.  At this time, the Debtor is not presently aware of any intention to pursue other claims. The Debtor specifically reserves the right to pursue Avoidance Actions against holders of Class 6 Claims, but any such Avoidance Actions against holders of Class 6 Claims shall waived and irrevocably released without further action of the Debtor or Reorganized Debtor on the Effective Date.  Any claims against Agfa shall be retained and include all claims regarding its Secured and Unsecured Claims and lien including Avoidance Actions to the extent it does not accept its treatment under the Plan.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Causes of Action against it as any indication that the Debtor, the Reorganized Debtor or the Creditor Representative as applicable, will not pursue any and all available Causes of Action against it.  The Debtor, the Reorganized Debtor, or the Creditor Representative, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, the Debtor, Reorganized Debtor, or Creditor Representative as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of the Plan.  Except as expressly provided to the contrary in the Plan, including with respect to the provisions set forth in Article IX of the Plan, the Reorganized Debtor reserves and shall retain the Causes of Action (but not preference actions against members of Class 6) notwithstanding the rejection or repudiation of any Executory Contract or unexpired lease during the Chapter 11 Case or pursuant to the Plan.  In accordance with § 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action other than (i) Avoidance Actions against Insiders, Armata or Insiders of Armata which may be brought by the Creditor Representative, and (ii) Avoidance Actions against trade creditors which shall be waived and released on the Effective Date.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action (other than Avoidance Actions against Insiders, Armata or Insiders of Armata which may be brought by the Creditor Representative), and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

I.    *Financing*

The Debtor intends to obtain financing to satisfy the Secured Claims of Peoples on or around the Effective Date.  This financing shall require the potential lender to obtain a first priority lien on all the Debtor's Assets (other than the Fujifilm Printer Collateral and certain equipment of Agfa), any amount due from Toys R Us and any tax refund or related proceeds of a tax refund from the State of Massachusetts.  Entry of the Confirmation Order shall entitle any lenders that are willing to and actually provide financing to the Debtor in an amount that is sufficient, when combined with other funds on hand, to satisfy the Allowed Secured Claims of Peoples Bank as set

-29-

forth in the Plan and the Court will enter such orders as are necessary to memorialize such first priority liens on those Assets superior to all other Liens held by any other lienholder.

J.    *Creditor Representative*

a.    Appointment.  On or before the Confirmation Date, the Committee shall select an individual to act as the Creditor Representative, as well as an alternate, and shall disclose the identity of the Creditor Representative and the alternate to the Debtor and the Court prior to the Confirmation Hearing. The Creditor Representative may retain counsel as necessary to enforce its rights in the event of a default by the Debtor or Reorganized Debtor under the Plan. Upon the dissolution of the Committee, the Creditor Representative shall be appointed subject to approval by the Court.

b.    Duties.  The Creditor Representative shall be authorized and empowered to (1) pursue the Debtor's compliance with the terms of the Plan in the event of a default after giving the Debtor fourteen (14) business days to cure any default and  (2) exercise all of the powers of the Debtor in connection with the Avoidance Actions against any Insider of the Debtor, Armata  or Insider of Armata. In all circumstances, the Creditor Representative shall act in the best interests of the holders of Allowed Unsecured Claims.  The Creditor Representative or his/her agent shall maintain books and records containing an accounting of receipts and disbursements. The Creditor Representative may retain counsel in the event of a default by the Reorganized Debtor under the Plan.

c.    Compensation.  The Creditor Representative shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, but any services associated with monitoring the Debtor's performance under the Plan or administering payments under the Plan shall not be borne by the Debtor,  but be paid for from and reduce the quarterly payments otherwise payable to the holders of Allowed Unsecured Claims in Class 6.  In the event of a default by the Reorganized Debtor under the Plan, the Creditor Representative shall be entitled to the reimbursement by the Reorganized Debtor of the Creditor Representative's fees and costs, including reasonable attorneys' fees, incurred in enforcing its rights. Any reasonable fees and/or costs incurred by the Creditor Representative in enforcing its rights upon a default by the Reorganized Debtor under the Plan, including reasonable attorneys' fees, must be paid in full by the Reorganized Debtor before such default will be deemed to be cured.

d.    Resignation and Replacement.  The Creditor Representative may resign by giving written notice of resignation to the Reorganized Debtor and the alternate.  Within forty-five days of such resignation becoming effective, the Creditor Representative shall provide a final accounting to the Reorganized Debtor and the alternate and will thereupon be discharged from the performance of any further duties. The Creditor Representative may only be removed for cause by the Bankruptcy Court after notice and hearing. Upon the resignation or removal of the Creditor Representative, the alternate Creditor Representative selected by the   Creditors' Committee prior to the Confirmation Hearing and approved by the Bankruptcy Court at Confirmation shall serve as the Creditor Representative.

e.    Conflicts.  If any claim, cause of action, objection, settlement or other act of, or on behalf of, the Debtor gives rise to a conflict on behalf of the Creditor Representative, the Creditor Representative shall inform the Reorganized Debtor of the conflict not later than two (2) Business

Days from discovery of the conflict by the Creditor Representative.  Immediately upon discovery of the conflict by the Creditor Representative, the Creditor Representative shall withdraw from any and all involvement concerning the matter or issue giving rise to the conflict, and shall notify the alternate to serve as the Creditor Representative with respect to such matter or issue.

       f.       Discharge.  After the earlier of the payment of Allowed Unsecured Claims pursuant to the Plan or all of its duties under the Plan have been fully performed, the Creditor Representative shall be discharged of his/her duties.

### ARTICLE VII.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption and Rejection of Executory Contracts and Unexpired Leases*

      On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or unexpired leases set forth on an exhibit (the Assumption Exhibit") will be deemed assumed by the Reorganized Debtor in accordance with the provisions and requirements of §§ 365 and 1123 of the Bankruptcy Code, other than: (1) those that are identified on a schedule of rejected Executory Contracts and unexpired leases filed with the Bankruptcy Court within thirty (30) days of the Effective Date; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or unexpired leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or unexpired lease pursuant to which the requested effective date of such rejection is after the Effective Date.  Entry of the Confirmation Order shall constitute a Court order approving the assumptions or rejections of such Executory Contracts or unexpired leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and unexpired leases, pursuant to §§ 365(a) and 1123 of the Bankruptcy Code.  To the extent there are any defaults in the any Executory Contracts, the Debtor will state the amount of the cure in the Assumption Exhibit.  The Debtor does not presently anticipate any substantial increase in the total amount of Unsecured Claims as a result of any rejection of any leases or Executory Contracts.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and unexpired leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or unexpired lease assumed pursuant to the Plan or by Court order shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or unexpired leases pending on the Effective Date shall be subject to approval by a Final Order of the Court on or after the Effective Date.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or unexpired lease or to exercise any other default-related rights with respect thereto.  The Debtor will serve notice of its intent to assume any Executory Contract or unexpired lease at least 21 days before it intends to assume the contract and will serve such notices prior to the Confirmation Hearing.

Assumption of Lease:  The Debtor's principal place of business is located at property commonly referred to as 100 Marketing Drive, Suffield CT (the "Premises"). The Debtor is the tenant under a lease of the Premises dated April 28, 2005, as amended by Amendment to Lease dated January 8, 2009, Amendment to Lease dated March 10, 2015, and Amendment to Lease dated March 29, 2016, Amendment to Lease dated April 1, 2016 (collectively, the "Lease") from Marketing Research Park, LLC (the "Landlord" or "MRP"), an entity which is owned by Kevin Armata, the principal of the Debtor. The Debtor has negotiated a reduced rental obligation for the Premises of $100,000.00 per month beginning as of May 2019. This monthly rental obligation to MRP owed by the Debtor is in addition to the Lease Cap Amount that Reorganized Debtor is to pay to cure any mortgage arrearage owed to First National Bank of Suffield Bank aka Peoples Bank ("FNB") as noted below.  During the course of the bankruptcy case, the Debtor negotiated an arrangement wherein it paid less than the monthly rent due under the lease (approximately $130,000 per month) to further the reorganization effort, but the Debtor still was responsible to pay the balance. In some months the Debtor did not make sufficient rent payments to MRP or its agent Armata Realty, LLC.  As a result, the Debtor owes post-petition rent arrears that are in excess of $470,000.00 as of May 2019.  As of May 2019, FNB asserts that is owed no less than approximately $470,000.00 in delinquent mortgage obligations.  MRP and its agent, Armata Realty LLC, will waive any distribution from the Debtor on the rent arrearage except for amounts sufficient to satisfy FNB and an agreement has been reached for the Debtor or Reorganized Debtor to pay any outstanding arrearage owed to FNB  and other payments in the approximate amount of $130,000 over the last two weeks of June and the month of July with an additional sum of $130,000 being paid from the replacement financing that will pay out People's Bank following the Effective Date (the "Refinance Payment").  The Refinance Payment will be applied against the Lease Cap Amount Additional payments will be made after the Effective Date in equal monthly installments over a six month period up to the Lease Cap Amount of $358,000, the total of which shall be deemed the cure amount the Debtor must pay to reinstate the Lease (and as noted, is in addition to regular monthly lease payments as set forth in this paragraph).

Upon the Effective Date, the Debtor shall be deemed to have assumed the Lease with MRP as modified as set forth above and in the Settlement with the Committee as set forth herein.

B.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or unexpired leases, if any, must be filed with the Court within thirty (30) days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection.  Any Claims arising from the rejection of an Executory Contract or unexpired lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtor, the Reorganized Debtor, the Estate, or property of the foregoing parties, without the need for any objection by the Debtor or the Reorganized Debtor, as applicable, or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  Claims arising from the rejection of the Debtor' Executory Contracts or unexpired leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.A.12 of the Plan, as applicable. The Debtor will serve notice on all parties to Executory

-32-

Contracts or Unexpired Leases that the Debtor intends to reject Executory Contracts or Unexpired Leases no later than 30 days prior to the Confirmation Hearing.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or unexpired lease, as reflected on the Cure Notice shall be satisfied, pursuant to § 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or as soon as reasonably practicable thereafter or as set forth on the Assumption Exhibit, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or unexpired leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default; (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of § 365 of the Bankruptcy Code) under the Executory Contract or unexpired lease to be assumed; or (3) any other matter pertaining to assumption, the cure payments required by § 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. The Debtor will include in its notice of intent to assume any Executory Contract or unexpired lease Cure notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties. The notice will give parties no less than 21 days from mailing or Filing to review the proposed assumption and Cure amounts and any objection by a counterparty to an Executory Contract or unexpired lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtor prior to the deadline set forth in the notice to be determined by the Debtor. Any counterparty to an Executory Contract or unexpired lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount. Notwithstanding anything herein to the contrary, in the event that any Executory Contract or unexpired lease is removed from the Schedule of Rejected Executory Contracts and unexpired leases after such 21-day deadline, a Cure Notice of proposed assumption and proposed amounts of Cure Claims with respect to such Executory Contract or unexpired lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or unexpired lease can be assumed. In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or unexpired lease is greater than the amount set forth in the applicable Cure Notice, the Debtor or Reorganized Debtor, as applicable, will have the right to add such Executory Contract or Unexpired lease to the Schedule of Rejected Executory Contracts and unexpired leases, in which case such Executory Contract or unexpired lease will be deemed rejected as the Effective Date. Assumption of any Executory Contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or unexpired lease at any time before the date that the Debtor assume such Executory Contract or unexpired lease. Any Proofs of Claim Filed with respect to an Executory Contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

D.    *Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired leases*

The Debtor reserve its right to assert that rejection or repudiation of any Executory Contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor under such contracts or leases. Notwithstanding any

-33-

non-bankruptcy law to the contrary, the Debtor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtor from counterparties to rejected or repudiated Executory Contracts or unexpired leases.

E.    **Exculpation**

**Except as otherwise provided in the Confirmation Order, the Creditors' Committee, its members, and any employees, agents or professionals retained by each Committee member, Neubert Pepe & Monteith PC, Lowenstein Sandler LLP, BlumShapiro & Co., P.C., TrueNorth Capital Partners LLC, Tactical Solutions, LLC and Zeisler & Zeisler, P.C. and any individual employed by any of the preceding entities (the "Exculpated Parties"), or any direct or indirect predecessor in interest to any of the foregoing persons, shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Case, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from the fraud, willful misconduct, gross negligence or legal or accounting malpractice of any such party. The rights granted hereunder are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under § 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.**

F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or unexpired lease, and Executory Contracts and unexpired leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements, and restatements to prepetition

-34-

Executory Contracts and unexpired leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### G.      Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or unexpired lease on the Schedule of Rejected Executory Contracts and unexpired leases, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or unexpired lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, or, after the Effective Date, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

### H.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to § 365(d)(4) of the Bankruptcy Code.

## ARTICLE VIII.

### A.      Distributions – Generally

The Reorganized Debtor will make all distributions required by the Plan. The Creditor Representative shall make all distributions to holders of Allowed Class 6 Claims of General Unsecured Creditors.

### B.      Distributions of Cash

Any payment of Cash made by Reorganized Debtor pursuant to the Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

### C.      Distributions Free and Clear

Except as otherwise provided herein, any distributions or transfers by or on behalf of the Debtor under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, shall be free and clear of any liens, claims, and encumbrances, and no other entity shall have any interest — legal, beneficial, or otherwise — in assets transferred pursuant to the Plan.

### D.      Timing of Distributions

Unless otherwise provided herein, any distribution to be made by the Reorganized Debtor shall be made at the time provided in Article II or Article III of this Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

E.      *Delivery of Distributions*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents. The holder must notify the Reorganized Debtor in writing of a change of address or, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different than the address of such holder as set forth in the Schedules. The Reorganized Debtor shall not be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided herein.

F.      *Undeliverable and Unclaimed Distributions*

If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies the Reorganized Debtor, as appropriate, in writing of such holder's then-current address, at which time all missed distributions shall, subject to the final sentence of this paragraph, be made as soon as is practicable to such holder, without interest. Checks issued by the Reorganized Debtor in respect of Allowed Claims shall be null and void if not negotiated within one hundred and sixty (160) days after the date of issuance thereof. After such date, all such distributions shall be deemed unclaimed property under § 347(b) of the Bankruptcy Code and shall become unencumbered Cash and property of the Reorganized Debtor. At the request of the Creditor Representative but prior to the 160 day period, the Creditor Representative may elect to locate, for a period of 60 days, any Claim holder whose distribution that is returned as undeliverable, but all costs for such efforts to locate the Claim holder shall be borne by and deducted from any distribution due or to be made to such Claim holder. In cases where the Creditor Representative is unable to locate the affected Claim holder as set forth in this paragraph, after such date, all such distributions shall be deemed unclaimed property under § 347(b) of the Bankruptcy Code and shall become unencumbered Cash and property of the Reorganized Debtor.

G.      *Setoffs*

To the extent permitted under applicable law, the Reorganized Debtor may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and causes of action of any nature that the Debtor has asserted in writing against the holder of such Allowed Claim. Neither the failure to affect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor of any such claims, rights and causes of action that the Debtor may possess against such holder. *H.      Application of Distributions*

Distributions to any holder of an Allowed Claim shall be applied first to the satisfaction of the principal portion (as determined for federal income tax purposes) of any such Claim and thereafter to the remaining portion of such Allowed Claim, if any.

I.      *Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtor, as applicable, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the

Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution, including withholding tax obligations in respect of in-kind (non-Cash) distributions. Any party issuing any instrument or making an in-kind (non-Cash) distribution under the Plan has the right, but not the obligation, to refrain from making a distribution until the holder of the Allowed Claim, for which such distribution is to be made, has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

**ARTICLE IX.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *No Distributions Pending Allowance*

Notwithstanding any other provision herein, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on any portion of that Claim unless and until and only to the extent such Claim becomes allowed.

B.      *Resolution of Disputed Claims*

1.      The Reorganized Debtor or the Creditor Representative, as applicable, shall have the right to make, file and prosecute objections to Claims.  A copy of each objection shall be served upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtor), but in no event shall the service of such an objection be later than one (1)  month after the Effective Date except as set forth in the Plan, unless such date is extended by order of the Bankruptcy Court. All objections shall be litigated to a Final Order except to the extent such objection is withdrawn, or such objection is compromised, settled or otherwise resolved.

2.      Reorganized Debtor will reserve sufficient Cash for Disputed Claims.

3.      The Debtor may, at any time, request the Bankruptcy Court to estimate any Claim pursuant to § 502(c) of the Bankruptcy Code, regardless of whether that Debtor previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim, at any time, including during litigation concerning any objection to such Claim.  In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on the Allowed amount of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim, a Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

4.      If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Reorganized Debtor, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided herein, distribute to the holder of such Allowed

Claim an amount that provides such holder with the same percentage recovery, as of such date, as other holders of Claims in the relevant Class that were Allowed on the Effective Date.

5.      To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed but rather such distribution amount shall be paid to the other Creditors on a Pro Rata basis in accordance with the terms of the Plan.

## ARTICLE X.
## CONDITIONS PRECEDENT TO
## EFFECTIVE DATE OF THE PLAN

*Conditions Precedent to Effective Date*

The Effective Date of the Plan will occur on the Business Day as determined by the Debtor after it reasonably determines that the following conditions have been met or waived:

1.      The Bankruptcy Court has entered the Confirmation Order and it is a Final Order, and such order is in form and substance acceptable to the Debtor and the Committee.

2.      All actions, documents, certificates and agreements necessary to implement this Plan have been affected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

3.      All documents and agreements necessary to implement the Plan, have (a) been tendered for delivery and/or (b) been effectuated or executed, as applicable.

4.      All governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in this Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

5.      All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

6.      Consummation of a sale or refinance of the Debtor's assets in an amount, together or other Cash on hand, necessary to satisfy the Allowed Secured Claims of People's.

7.      The Effective Date of the Plan must occur on before August 31, 2019.

*Waiver or Extension of Conditions*

The conditions to Consummation of the Plan set forth in this Article, other than the condition that the Bankruptcy Court has entered a Confirmation Order in form and substance acceptable to the Debtor, the Committee and People's may be waived, in whole or in part, by the Debtor, in each case after notice to the Committee and People's without further notice, leave, hearing or order of the Bankruptcy Court or any formal action and, thereupon, Consummation may occur.  The Debtor can

extend the deadline for consummation of the Plan with the consent of the Committee or Creditor Representative and People's.

*Effect of Non-Occurrence of Conditions to Consummation*

If prior to Consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or unexpired leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, or Causes of Action; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE XI.
## SETTLEMENT, RELEASES,
## INJUNCTION AND RELATED PROVISIONS

A.    *Discharge, Compromise and Settlement*

Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to the Debtor or the Reorganized Debtor or any of its respective assets, property and Estate, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, or Equity Interests or other rights of a holder of an Equity Interest or other ownership interest, and upon the Effective Date, the Debtor and the Reorganized Debtor shall (i) be deemed to have received a discharge under § 1141(d)(1)(A) of the Bankruptcy Code and release from any and all Claims and any other obligations, suits, judgment s, damages, debts, rights, remedies, Causes of Action or liabilities, and any Equity Interests or other rights of a holder of an Equity Security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under § 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under § 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan other than to enforce any rights to distributions with respect to such property under the Plan and (ii) terminate and cancel all rights of any Equity Security holder in the Debtor and all Equity Interests.

Except as expressly provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtor, all of the Debtor's assets, property and Estate and the

-39-

Reorganized Debtor and all of its assets and property any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and all Equity Interests or other rights of a holder of an Equity Interest, relating to the Debtor or Reorganized Debtor or any of its respective assets, property and Estate based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date other than to enforce any right to distributions under the Plan with respect to such property under the Plan.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and any Equity Interests or other rights of a holder of an Equity Interest and termination of all rights of any such holder in any of the Debtor, pursuant to §§ 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtor, the Reorganized Debtor or any of its respective assets, property and Estate at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any holder of any Equity Interest in any of the Debtor or terminated Equity Interest.

B.    *Protection against Discriminatory Treatment*

In accordance with § 525 of the Bankruptcy Code, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Case (or during the Case but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Case.

## ARTICLE XII.
## MODIFICATION, REVOCATION,
## OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments*

Subject to the limitations contained herein, the Debtor reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in Bankruptcy Code § 1127 and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor expressly reserve its rights to alter, amend, or modify materially the Plan with respect to the Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan made prior to Confirmation are approved pursuant to § 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of the Plan*

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Equity Interests; (ii) prejudice in any manner the rights of the Debtor or any other Entity, including the holders of Claims or Equity Interests; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE XIII.
## RETENTION OF JURISDICTION

Pursuant to Bankruptcy Code §§ 105(c) and 1142 and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Case and all Entities with respect to all matters related to the Case, the Debtor and this Plan as legally permissible, including, without limitation, jurisdiction to:

A.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

B.      resolve any issues related to any matters adjudicated in the Chapter 11 Case;

C.      hear, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date, provided that the Reorganized Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

D.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan or the Disclosure Statement;

E.      resolve any case, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

F.      issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan, except as otherwise provided in this Plan;

G.      enforce the terms and condition of this Plan and the Confirmation Order;

H.    resolve any case, controversies, suits or disputes with respect to the release, exculpation, indemnification and other provisions contained in ARTICLE XI hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

I.    hear and determine the Avoidance Actions that may be asserted by the Creditor Representative against the Debtor's Insiders, Armata and Insiders of Armata;

J.    enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

K.    resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

L.    enter an order concluding or closing the Chapter 11 Case.

All of the foregoing applies following the Effective Date; provided, that from the Confirmation Date through the Effective Date, in addition to the foregoing, the Bankruptcy Court shall retain jurisdiction with respect to all other matters of this Plan that were subject to its jurisdiction prior to the Confirmation Date; provided, further, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement.  Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the Bankruptcy Court.

### ARTICLE XIV
### MISCELLANEOUS PROVISIONS

A.    Dissolution of the Committee.

On the later of the (1) Effective Date or (2) the date all objections to Claims have been adjudicated by Final Order, the Committee shall dissolve, provided, however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard with respect to (i) Claims and/or applications for compensation by Professionals and (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Creditors' Committee is a party.  Upon dissolution of the Committee, all current and former members of the Committee and their respective officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Case, and the retention or employment of the Committee's attorneys, accountants, and other agents shall terminate, except as otherwise provided in this Plan.

B.    Insurance.

The Debtor will continue to maintain appropriate insurance coverage consistent with its prior business practices

C.    *Intentionally Deleted.*

D.    *Entire Agreement*

-42-

Except as otherwise described herein, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

E.    *Closing of Chapter 11 Case*

Subject to the pending matters, the Reorganized Debtor will within one hundred eighty (180) days after the Effective Date, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case. The Reorganized Debtor will provide written notice to the Creditor Representative of its intention to close the Chapter 11 Case contemporaneous with filing any such motion.

F.    *Successors and Assigns*

This Plan shall be binding upon and inure to the benefit of the Debtor and its respective successors and assigns, including, without limitation, the Reorganized Debtor.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

G.    *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is consummated.  Neither the filing of the Plan and this Disclosure Statement, any statement or provision contained herein, nor the taking of any action by the Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the holders of Claims or Equity Interests or other Entity; or (2) any holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to the Plan, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an Executory Contract or unexpired lease or that the Debtor or the Reorganized Debtor has any liability thereunder.

Except as explicitly provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, Avoidance Actions, or other rights of the Debtor or the Reorganized Debtor under any executory or non-executory contract or unexpired or expired lease.

Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor, as applicable, under any executory or non-executory contract or unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtor or Reorganized Debtor, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

H.      *Severability*

       If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

I.      *Service of Documents*

       All notices, requests, and demands to or upon the Debtor or the Reorganized Debtor to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

       Windsor Marketing Group, Inc.
       Attention: Kevin Armata, CEO
       100 Marketing Way
       Suffield, CT 06078

       **With copies to:**

       Zeisler & Zeisler, P.C.
       Attn: Matthew K. Beatman, Esq.
       10 Middle St.
       15th Floor
       Bridgeport, CT 06604

J.      *Plan Exhibits and Schedules*

       All exhibits and schedules to the Plan are incorporated and are a part of the Plan as if set forth in full therein.

K.      Effect of Non-Occurrence of Conditions to Consummation

If prior to Consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or unexpired leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the

Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, or Causes of Action; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

# ARTICLE XV.
## CONFIRMATION OF THE PLAN

**A.     Confirmation Hearing.**   Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Confirmation Hearing with respect to the Plan is scheduled to commence on the date and as at the time set forth in the order approving this Disclosure Statement (prevailing Eastern Time).  The hearing may be adjourned or continued from time to time by the Debtor or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing (or an appropriate filing with the Bankruptcy Court) or any subsequent adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a chapter 11 plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor, the basis for the objection and the specific grounds therefor, and must be filed with the Clerk of the Bankruptcy Court electronically using the Bankruptcy Court's Case Management/Electronic Case File ("CM/ECF") System at https://ecf.ctb.uscourts.gov (a CM/ECF password will be required). Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.     Confirmation.**   At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan. (a) Confirmation Requirements. Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

• the plan complies with the applicable provisions of the Bankruptcy Code;

• the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

• the plan has been proposed in good faith and not by any means forbidden by law;

• any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

• the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

• with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

• subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

• except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive deferred Cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred Cash payments, over a period not exceeding 5 years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

• if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

• confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtor believes that:

• the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

• the Debtor, as the proponent of the Plan, has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

• the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

(1) Acceptance.

-46-

Claims in Classes 1, 2, 3, 4, 5, and 6 are impaired under the Plan and are entitled to vote to accept or reject the Plan. If certain Classes reject the Plan, the Debtor will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan, any exhibit, or schedule thereto or any Plan Document, in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Debtor believes that the Plan satisfies the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Claims and Interests in Classes 8, 10 and 11. The Debtor also will seek confirmation of the Plan over the objection of any individual holders of Claims who are members of an accepting Class. There can be no assurance, however, that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

(2) Unfair Discrimination and Fair and Equitable Test. To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan. A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class. The Debtor believes the Plan will not discriminate unfairly against any non-accepting Class.

(3) Feasibility; Financial Projections. The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan and retain sufficient liquidity and capital resources to conduct its business. In connection with developing the Plan, the Debtor has prepared detailed financial projections (the "Financial Projections"), attached as Exhibit B hereto, which detail, among other things, the financial feasibility of the Plan. The Financial Projections indicate, on a pro forma basis, that the projected level of Cash flow is sufficient to satisfy all of the Reorganized Debtor's future debt and debt related interest cost, research and development, capital expenditure and other obligations during this period. Accordingly, the Debtor believes that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtor. THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTOR MAKES NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS. THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE XI. IN LIGHT OF THESE RISKS AND

UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS. The Debtor prepared the Financial Projections based upon certain assumptions that it believes to be reasonable under the circumstances. The Financial Projections have not been examined or compiled by independent accountants. Moreover, such information is not prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). The Debtor makes no representation as to the accuracy of the Financial Projections or its ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor and its management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with its evaluation of the Plan.

(4)   Best Interests Test. The "best interests" test requires that the Bankruptcy Court find either: • that all members of each impaired class have accepted the plan; or • that each holder of an allowed claim or interest in each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on such date. To determine what the holders of Claims and Interests in each impaired Class would receive if the Debtor were liquidated under chapter 7 on the Confirmation Date, the Bankruptcy Court must determine the dollar amount that would have been generated from the liquidation of the Debtor's assets and properties in a liquidation under chapter 7 of the Bankruptcy Code. The Cash that would be available for satisfaction of Claims and Interests would consist of the proceeds from the disposition of the assets and properties of the Debtor, augmented by the Cash held by the Debtor. Such Cash amount would be: (i) first, reduced by the amount of the Allowed Secured Claims; (ii) second, reduced by the costs and expenses of liquidation under chapter 7 (including the fees payable to a chapter 7 trustee and the fees payable to professionals that such trustee might engage) and such additional administrative claims that might result from the termination of the Debtor's business; and (iii) third, reduced by the amount of the Allowed Administrative Expense Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims. Any remaining net Cash would be allocated to creditors and stakeholders in strict order of priority contained in section 726 of the Bankruptcy Code. Additional claims would arise by reason of the breach or rejection of obligations under unexpired leases and executory contracts. To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtor's assets and properties, after subtracting the amounts discussed above, must be compared with the value of the property offered to each such Class of Claims under the Plan. After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Reorganization Case, the Debtor has determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would have received pursuant to the liquidation of the Debtor under chapter 7. Moreover, the Debtor believes that the value of distributions to each Class of Allowed Claims in a chapter 7 case would be materially less than the value of distributions under the Plan and any distribution in a chapter 7 case would not occur for a substantial period of time. It is likely that a liquidation of the Debtor's assets could take more than a year to complete, and distribution of the proceeds of the liquidation could be delayed for up to six months after the completion of such liquidation to resolve claims and prepare for distributions. In

the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged. The Debtor, with the assistance of its advisors, have prepared a liquidation analysis that summarizes the Debtor's best estimate of recoveries by creditors and equity interest holders in the event of liquidation (the "Liquidation Analysis"), which is attached hereto as Exhibit C. The Liquidation Analysis provides: (a) a summary of the liquidation values of the Debtor's assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtor's estates, and (b) the expected recoveries of the Debtor's creditors and equity interest holders under the Plan. The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtor's management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor and its management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtor and its management. Accordingly, the values reflected might not be realized. The chapter 7 liquidation period is assumed to last 12 to 18 months following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations as going concerns or as individual assets, the collection of receivables and the finalization of tax affairs. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with its evaluation of the Plan.

(5) Intentionally Deleted.

(6) Classification of Claims and Interests. The Debtor believes that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

(7) Exemption from Certain Transfer Taxes. To the fullest extent permitted by applicable law, all sale transactions consummated by the Debtor and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, the sale by the Debtor of any owned property pursuant to section 363(b) of the Bankruptcy Code, and any assumption, assignment, and/or sale by the Debtor of its interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

## XVI.

## VOTING PROCEDURES AND REQUIREMENTS

A.    **Voting Deadline**

IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN ALL CLASSES TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION. Such holders should read the ballot carefully and follow the instructions contained therein. Please use only the ballot that accompanies this Disclosure Statement.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE SET FORTH IN THE ORDER APPROVING THIS DISLCOURE STATEMENT**.

**IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE DEBTOR'S VOTING AGENT AT THE NUMBER SET FORTH BELOW.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.**

**FAXED COPIES OF BALLOTS WILL NOT BE ACCEPTED UNLESS YOU HAVE REQUESTED AND RECEIVED APPROVAL TO SUBMIT A FAXED BALLOT BY THE VOTING AGENT BELOW.  IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:**

ZEISLER & ZEISLER P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Attn:   Matthew K. Beatman, Esq.
(203) 368-4234

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the address set forth immediately above.

**B.**      **Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims occurs when holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that class that cast ballots for acceptance or rejection of the plan of reorganization vote to accept the plan. Thus, acceptance of the Plan by each impaired class will occur only if at least two-thirds in dollar amount and a majority in number of the holders of the Claims in the respective class that cast its ballots vote in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**C.**      **Voting Procedures**

**1.**            **Holders of Allowed Claims**

-50-

All holders of Allowed Claims as of the Record Date should complete the enclosed ballot. To be counted, properly executed ballots must be returned to the Voting Agent so that they are received by the Voting Agent before the Voting Deadline.

**2.**           <u>**Withdrawal of Ballot**</u>

Any voter that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline. To be valid, the notice of withdrawal must (a) be signed by the party that signed the Ballot to be revoked and (b) be received by the Voting Agent before the Voting Deadline. The Debtor may contest the validity of any withdrawals.

Any holder that has delivered a valid ballot may change its vote by delivering to the Voting Agent a properly completed subsequent ballot so as to be received before the Voting Deadline. In the case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to the holders of Allowed Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan (*e.g.*, Administrative Expense Claims, Priority Non-Tax Claims, and certain Secured Claims).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, persons not holding its Claims as capital assets, financial institutions, tax-exempt organizations, persons holding Claims who are not the original holders of those Claims or who acquired such Claims at an acquisition premium, and persons who have claimed a bad debt deduction in respect of any Claims).

*THE DEBTOR AND ITS PROFESSIONALS DO NOT INTEND TO AND ARE NOT GIVING TAX OR OTHER LEGAL ADVICE TO ANY CREDITORS. THE DEBTOR ONLY PROVIDES THIS GENERAL INFORMATION FOR INFORMATIONAL PURPOSES ONLY TO ASSIST THE PARTIES INVOLVED IN EVALUATING HOW THE PLAN AFFECTS*

*THEM FOR TAX PURPOSES. CREDITORS ARE ADVISED AND URGED TO CONSULT WITH THEIR RESPECTIVE TAX ADVISORS REGARDING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES. NO RULING HAS BEEN REQUESTED FROM THE IRS AS TO TAX CONSEQUENCES OF THE PLAN. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE IRS WOULD AGREE WITH THE FOLLOWING DISCUSSION.*

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (c) holders of Claims and Equity Interests should seek advice based on its particular circumstances from an independent tax advisor.*

## A.      Tax Consequences to Holders of Claims

The implementation of the Plan may have significant and complex federal, state, local and foreign tax consequences for Creditors. No ruling from the United States Internal Revenue Service or any state, local or foreign taxing authority has been or will be sought or obtained with respect to any federal, state, local or foreign tax consequences of the Plan. The tax consequences for any particular Creditor may be affected by matters not addressed in this disclosure statement or in the Plan. For example, certain types of investors (including non-resident aliens, life insurance companies and tax-exempt organizations) may be subject to special rules not discussed below. In addition, the Internal Revenue Code ("IRC"), the Treasury Department's regulations promulgated thereunder, and interpretations of the IRC and Regulations by the IRS in its rulings and other announced positions and by the courts are continually subject to change. Thus, the potential tax consequences described below are general in nature, are not intended to be complete or detailed, and are subject to significant exceptions and uncertainties. The discussion below covers only certain of the federal income tax consequences associated with the implementation of the Plan. This discussion does not attempt to comment on all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular Creditor which may modify or alter the consequences described herein. This discussion does not address state, local or foreign tax consequences.

The federal income tax treatment of payments received by a Creditor in this Case will vary depending on a number of factors, including the classification of the Creditor for tax purposes, the Creditor's method of accounting, the Creditor's tax residence, and the origin or genesis of the Creditor's claim. Thus, tax treatment will depend on whether the Creditor is an individual, a partnership or a corporation, whether the Creditor uses the cash method or the accrual method of accounting, and whether the Creditor is a foreign person for income tax purposes. In general, a Creditor receiving a distribution under the Plan in satisfaction of a Claim will realize income, gain or loss measured by the difference between (i) the cash and the fair market value of property received under the Plan and (ii) the Creditor's adjusted tax basis in the Claim. The income, gain or loss realized by the Creditor will be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Creditor's trade or business for the

performance of services or for the sale of goods or merchandise. Generally, the gain or loss will be capital gain or loss if the Claim is a capital asset in the Creditor's hands. The federal income tax consequences of a distribution under the Plan also will depend on the nature of the original transaction pursuant to which the Claim arose. For example, distribution on account of the principal amount due on a loan is not included in the Creditor's gross income, whereas distribution on account of interest on the loan or on account of rent is included in the Creditor's gross income to the extent it was not previously included in income. The federal income tax consequences of a distribution to a Creditor also will depend on whether an amount representing the distribution has previously been included in the Creditor's gross income or whether the Creditor has previously claimed a loss or bad debt deduction for that amount. For example, if a distribution is made in satisfaction of an account or note receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or the sale of goods or merchandise, and the Creditor has previously included the amount of the distribution in its gross income under its method of accounting, and has not previously written off the account or note receivable, the receipt of the distribution would not result in additional income to the Creditor. On the other hand, if such Creditor had written off the account or note receivable in a prior year, the Creditor would have to treat the amount of the distribution as income. Section 166 of the IRC permits a deduction for indebtedness that becomes wholly or partially worthless during a taxable year. In order to prove the worthlessness of the debt, the taxpayer must establish the existence of an "identifiable event" indicating worthlessness.

Information Reporting and Withholding

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, the following: (1) certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds; and (2) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. Holders are urged to consult its tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

## XVII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords Creditors the potential for the greatest recovery on its Claims and, therefore, is in the best interests of Creditors. If the Plan is not confirmed and consummated, the alternatives include (a) dismissal of the Debtor's Chapter 11 Case, (b) liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code, (c) an alternative Chapter 11 plan or plans or (d) continuation of the Debtor's Chapter 11 Case. The Debtor believes that the Plan is preferable to the alternatives described below because the Plan provides for an equitable, early distribution to the Debtor's Creditors and because any alternative to confirmation of the Plan would result in significant delays in and probable diminution of recoveries for Creditors.

    **A.**    **Dismissal of the Debtor's Chapter 11 Case.** If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor's Chapter 11 Case could be dismissed. The Debtor believes that dismissal of the Debtor's Chapter 11 Case would result in piecemeal litigation and attachment of the Debtor's assets without Bankruptcy Court supervision. Such litigation would, in the Debtor's opinion, generate substantially less for Creditors than the sums which will be realized under the Plan, result in inequitable recoveries among Creditors, and potentially result in the closure of one or more of the Debtor's businesses.

    **B.**    **Liquidation Under Chapter 7.** If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor's Chapter 11 Case could be converted to a case under Chapter 7 of the Bankruptcy Code. If the Chapter 11 Case were converted, a Chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtor's estate and distribute the proceeds to Creditors in accordance with the priorities established under the Bankruptcy Code. The Debtor believes that Creditors would receive far less in a liquidation pursuant to Chapter 7 than they would under the Plan. A Chapter 7 trustee would receive a substantial commission for distributing the Debtor's assets. In addition, and much more significant, a Chapter 7 trustee likely would shut down the operations resulting in a significant reduction in the value of the Debtor's assets and a potentially significant increase in the amount of Administrative Claims against the Debtor. As illustrated on Exhibit C hereto, the Debtor's assets would decline drastically in value in a liquidation. The Debtor believes that recoveries on accounts receivable would decline significantly, possibly by as much as 50%. The Debtor would incur substantial costs for, among other things, terminating employees and contracted services, managing the wind down process, properly disposing of equipment and supplies, maintaining access to key records, maintaining security and necessary utilities, and disposing of normal wastes. These windup or shutdown costs all would be entitled to priority treatment as Chapter 7 administrative expenses. People's United Bank likely would be undersecured by additional millions of dollars, and its deficiency Claims would be added to Unsecured Claims. The same likely would be true for Creditors secured by personal property of the Debtor. The Debtor believes that Administrative Claims against the Debtor likely would absorb most if not all liquidation proceeds remaining after payment of Secured Claims. The Debtor believes that holders of Allowed Unsecured Claims likely would receive little or no distribution in a Chapter 7 case. After consideration of the effect a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Debtor's Creditors, including increased costs and expenses of liquidation under Chapter 7 and the increased Claims against the Debtor's estate, the Debtor has concluded that Creditors will receive a larger distribution and receive distributions more quickly under the Plan than they would receive in a Chapter 7 liquidation, in which it is likely they would receive no distribution.

    **C.**    **Alternative Chapter 11 Plan.** If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor, the Committee, or any other party in interest, could attempt to formulate an alternative Chapter 11 plan or plans. The Debtor has explored various alternatives in connection with the formulation and development of the Plan, and believes that an alternative plan is not a

realistic option in the facts and circumstances of this Chapter 11 Case. The Debtor believes that such proposals are not feasible or would result in reduced recoveries for Creditors. The Plan is the Debtor's good faith effort to balance all of the needs of parties in interest, with the goal of getting the greatest possible return to Creditors. The Debtor believes that the Plan implements a fair resolution of all claims and that this proposal is in the best interests of Creditors. The Debtor believes that failure to confirm the Plan and formulation of a new plan would result in substantial expense and delay to the bankruptcy estate, and negatively impact the time and amount of distributions to Creditors, all for no good purpose. It is highly unlikely that a Chapter 11 plan more favorable to Creditors than the Plan would be formulated. The Debtor believes that the Plan will enable Creditors to realize greater value under the circumstances than under any available alternative plan.

      **D.**      **Continuation of the Debtor's Chapter 11 Case.** If the Debtor remains in Chapter 11, it would remain subject to the operational difficulties and costs associated with Chapter 11 bankruptcy case, including US Trustee quarterly fees. The Debtor cannot continue to incur these costs indefinitely, and the Debtor believes that the continuation of these costs will reduce the amount available to Creditors. The continued payment of these costs would not be of any benefit to Creditors, as the Debtor believes that confirmation of a plan superior to the Plan is not likely or feasible.

## <u>CONCLUSION AND RECOMMENDATION</u>

      The Debtor believes, for the reasons described herein and, in the Plan, that the Plan offers Creditors the most favorable alternative under existing circumstances because it will provide the greatest recoveries to Creditors. Alternatives would involve significant delay, uncertainty and substantial additional administrative costs. ACCORDINGLY, THE DEBTOR URGES ALL CREDITORS WHO ARE ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING ITS BALLOTS SO THEY WILL BE RECEIVED NO LATER THAN THE DEADLINE IMPOSED BY THE COURT IN THE ORDER APPROVING THIS DISCLOSURE STATEMENT.

**[THE BALANCE OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]**

Dated this ___2___ day of ___July___, 2019.

Respectfully submitted,

WINDSOR MARKETING GROUP, INC.

By: _____

Kevin Armata

Its:    President

Attorneys for the Debtor:

Matthew K. Beatman, Esq.
ZEISLER & ZEISLER, P.C.
10 Middle Street
Bridgeport, CT 06604
Telephone 203.368.4234